EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> José A. Ruiz Rivera <br> Juez Superior <br> Tribunal de Primera Instancia <br> Sala de Ponce | 2006 TSPR 106 <br><br> 168 DPR \_\_\_\_ |

Número del Caso: AD-2002-2


Fecha: 28 de junio de 2006


Oficina de Administración de los Tribunales:

                         Lcdo. Alcides Oquendo Solís
                         Lcda. Ivonne Díaz Pérez

Abogados de la Parte Querellada:

                         Lcdo. Jesús Antonio Rodríguez Urbano
                         Lcdo. Carlos Fernández Nadal
                         Lcdo. Pedro Ortiz Álvarez
                         Lcdo. Juan M. Aponte Castro
                         Lcda. Luisselle Quiñones Maldonado


 Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

José A. Ruiz Rivera
Juez Superior
Tribunal de Primera Instancia          AD-2002-02
Sala de Ponce

PER CURIAM

San Juan, Puerto Rico, a 28 de junio de 2006.

En el ejercicio de nuestra jurisdicción disciplinaria nos corresponde la difícil tarea de separar del cargo de Juez Superior al licenciado José A. Ruiz Rivera. Los hechos que la Comisión de Disciplina Judicial determinó probados, por unanimidad, en el proceso disciplinario instado en su contra no permiten otro resultado, dada la gravedad de la conducta imputada. Examinemos los hechos que justifican esta determinación.

I.

A raíz de una carta enviada el 17 de enero de 2002 por el entonces Fiscal de Distrito Federal de Estados Unidos en Puerto Rico, Lcdo. Guillermo Gil Bonar, al entonces Juez Presidente del Tribunal Supremo, Hon. José A. Andréu García, se inició una investigación administrativa contra el Juez Superior José A. Ruiz Rivera. La referida carta, en esencia, destacaba que una investigación federal había revelado lo que podrían constituir violaciones éticas por parte de jueces del Tribunal General de Justicia de Puerto Rico. Uno de los jueces mencionados en la referida carta lo fue el Juez Superior José A. Ruiz Rivera, a quien Frankie Pietri Sepúlveda [en adelante, Pietri], testigo de la investigación federal, acusó de usar en varias ocasiones la sustancia controlada conocida como cocaína.

Tras ser suspendido de sus funciones judiciales por la gravedad de la imputación, la Oficina de Administración de los Tribunales [en adelante, OAT], investigó las alegaciones. Oportunamente, el 2 de octubre de 2002, formuló una querella imputando al Juez Ruiz Rivera cuatro cargos por violaciones a los Cánones de Ética Judicial de 1977, cuerpo ético que estaba vigente al momento de los hechos. Eventualmente, la OAT retiró uno de los cargos,[1] quedando sometida la querella por los siguientes tres:

_____

[1] El cuarto cargo imputado por la Oficina de Administración de los Tribunales expresaba:

*Primer Cargo*

El Querellado incurrió en conducta impropia incompatible con su cargo al procurar obtener y consumir sustancia bajo la creencia e intención de que se trataba de la sustancia controlada conocida como cocaína sin estar autorizado para ello. Dicha conducta lesiona la imagen de la Rama Judicial, le incapacita para ocupar el cargo de juez e infringe los Cánones I, X, XI, XXIV y XXVI de Ética Judicial.

*Segundo Cargo*

El Querellado incurrió en conducta impropia incompatible con su cargo consistente en que solicitó y obtuvo del también Juez Superior, Hon. Wilfredo Santos López, una declaración de autenticidad donde el Juez Ruiz Rivera era el compareciente, sin que dicha declaración estuviera relacionada con asuntos judiciales o fuera incidental a la función judicial. Dicha conducta viola las normas establecidas en la Resolución de 25 de febrero de 1982 y el Memorando Núm. 62 de 15 de mayo de 1982 que rigen las circunstancias para el otorgamiento de declaraciones de autenticidad por parte de los jueces.

*Tercer Cargo*

El Querellado, Hon. José A. Ruiz Rivera, incurrió en conducta impropia incompatible con su cargo al frecuentar privada y públicamente [sic] personas cuya dudosa reputación le constaba ya que conocía de la pendencia en cuanto a estas personas de casos criminales en que se alegaban infracciones a la Ley de Sustancias Controladas. Esta conducta

---

El Querellado incurrió en conducta impropia incompatible con su cargo al no informar en sus informes de actividad financiera extra judicial la existencia de un hijo procreado fuera de matrimonio y omitió toda información relacionada a sus obligaciones económicas con relación a tal hijo. Dicha conducta viola los Cánones de Ética Judicial I y X y a su Reglamento.

viola lo dispuesto en los Cánones I, X,
XI, XXIV, y XXVI de Ética Judicial.

La prueba desfilada ante la Comisión de Disciplina Judicial, y creída por ésta, reveló que el 30 de mayo y 14 de octubre de 1996 el Juez Ruiz Rivera presidió dos vistas preliminares en las que figuraron como imputados por violación a la Ley de Sustancias Controladas Pietri y la esposa de éste. El Juez Ruiz Rivera determinó causa contra Pietri, más no así contra la esposa de éste.

Tiempo después, a finales del mes de diciembre de 1996, mientras se encontraba en compañía de un amigo llamado Octavio González en el establecimiento "Hollywood´s Café and Pub" de Ponce, lugar que frecuentaba Ruiz Rivera, éste conoció a Pietri. Surge de la prueba que fue Octavio González quien presentó a Pietri y a Ruiz Rivera. Desde ese momento, la prueba revela que se desarrolló una relación de amistad. En esa ocasión los tres continuaron conversando y consumiendo bebidas alcohólicas en el lugar. En un momento de la noche, Pietri narró que los tres salieron al estacionamiento del local, en donde, consumieron cocaína.

Sobre este encuentro, señala el Informe de la Comisión, en parte:

> El Querellado admitió que conoció a Pietri en el "Pub" en las fechas antes indicadas, pero de forma muy casual. Intentó probar, en unión a otros testigos, que en esa ocasión estaba acompañado por su esposa. Negó haber compartido fuera del "Pub" con Pietri así como haber consumido "cocaína". La Comisión no dio credibilidad a esta versión de lo ocurrido. De igual

forma intentó impugnar <u>sin éxito</u> la credibilidad del testigo Pietri a través de testigos que testificaron sobre las medidas de seguridad e iluminación en el área de estacionamiento del "Pub". Informe de la Comisión de Disciplina Judicial, en la página 8 (subrayado nuestro).

Un segundo encuentro entre Pietri y Ruiz Rivera ocurrió en enero de 1997 en la fonda "La Bodeguita del Medio". En ese lugar, Pietri expresó que Ruiz Rivera le dio los números telefónicos de su teléfono celular, de su residencia y de su oficina. Al respecto, el Informe de la Comisión expresa:

> El Querellado admitió haber visitado la fonda "La Bodeguita del Medio". Testificó que vio a Pietri ese día en el lugar pero alegó que tan pronto se percató de la entrada de Pietri al lugar, se marchó de forma súbita. <u>La Comisión no dio credibilidad a gran parte de este testimonio ni a aquellos que intentaron corroborarlo</u>. Informe de la Comisión de Disciplina Judicial, en la página 9 (subrayado nuestro).

El tercer encuentro entre Ruiz Rivera y Pietri se acordó telefónicamente. Ambos viajaron en automóvil desde Ponce hasta San Juan en el vehículo de Ruiz Rivera, y los acompañarían, aunque en un vehículo separado, Octavio González y dos personas más identificadas como Rony y Jessy Ortiz.

Según surge del testimonio de Pietri, el grupo acudió al negocio "Coaches" en San Juan. Durante el trayecto, el juez querellado y Pietri consumieron cocaína. No obstante, al llegar al lugar acordado, Ruiz Rivera indicó sentirse incómodo, por lo que abandonó el lugar junto a Pietri. Éste declaró, además, que durante el trayecto de regreso,

Ruiz Rivera le expresó que sabía quién era, "y que había sacado a su esposa absuelta pero que contra él había mucha prueba". Añadió que tuvo "que renunciar el caso de asesinato de Tito Manuel por conflicto de intereses", en alusión a un proceso penal tramitado contra el alegado jefe de Pietri en asuntos relacionados a la distribución de sustancias controladas en el área sur del país. Informe de la Comisión, en la pág. 10.

Un cuarto encuentro, según narrado por el testigo principal del proceso, ocurrió en la residencia del querellado en la urbanización Camino Sur de Ponce. Pietri conocía la urbanización pues alegó haber estado anteriormente en ella jugando baloncesto con un amigo que residía en el lugar. Pietri indicó haber acudido a la urbanización a entregar cocaína al querellado. Expresó que ese día éste tenía una actividad familiar en su casa, y que Ruiz Rivera lo invitó a quedarse. Pietri, sin embargo, rechazó la invitación. Expresó, además, que como en ocasiones anteriores no cobró por el suministro de la sustancia.

Sobre estos dos últimos encuentros, la Comisión expresó en su Informe lo siguiente:

> El Querellado negó totalmente el encuentro y posterior viaje con Pietri hacia "Coaches". Aceptó que Pietri lo visitó un día en su hogar pero alegó que fue para pedirle un favor sobre un caso pendiente ante los tribunales. <u>La Comisión no dio credibilidad a la prueba tendiente a demostrar la versión del Querellado sobre estos encuentros</u>. Informe de la Comisión de Disciplina Judicial, en la página 10 (subrayado nuestro).

En mayo de 1997 Pietri ingresó a una institución penal federal. Eventualmente, narró los hechos antes descritos a funcionarios federales, lo que originó la querella que nos ocupa.

## II.

Al delinear las normas que rigen los trámites apelativos hemos destacado consistentemente que los foros de instancia están ubicados en mejor posición que los apelativos para evaluar prueba testifical, pues distinto a éstos, pueden apreciar de primera mano la forma en que declaran los testigos en busca de indicios que revelen deshonestidad. Por ello, hemos expresado reiteradamente que no sustituiremos las determinaciones de hechos de los foros de instancia en ausencia de "circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto." *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994). Véanse además, *Pérez v. Col. Cirujanos Dentistas de P.R.*, 131 D.P.R. 545, 562 (1992); *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172, 181 (1985).

La Comisión de Disciplina Judicial realiza la importante función de aquilatar la prueba para formular determinaciones de hechos, conclusiones de derecho y recomendaciones en procesos disciplinarios contra integrantes de la Judicatura. Aunque no tiene facultad para imponer sanciones, su rol en aspectos probatorios es igual al que ejercen otros foros de instancia, judiciales o administrativos.

Ahora bien, el ejercicio de estas funciones supone aquilatar la prueba a la luz de la carga probatoria aplicable a los procesos disciplinarios. Como se sabe, tal prueba consiste en prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas. *In re Caratini Alvarado*, res. el 9 de marzo de 2001, 2001 T.S.P.R. 46; véase, Regla 25 de las Reglas de Disciplina Judicial, res. 8 de marzo de 2005; 163 D.P.R. _____ (2005).

No existe una definición precisa de dicho criterio probatorio. Sin embargo, hemos reconocido que consiste de una carga probatoria "mucho más sólida que la preponderancia de la evidencia, pero menos rigurosa que la prueba más allá de toda duda razonable". También la hemos descrito como "como aquella [prueba] que produce en un juzgador de hechos una convicción duradera de que las contenciones fácticas son altamente probable[s]". *In re: Rebecca Rodríguez Mercado*, res. 15 de septiembre de 2005; 2005 TSPR 144; 165 DPR ____ (2005). Véase, *McCormick on evidence*, 5ta ed., Vol. 2, § 340 pág. 425 (1999).

Con lo anterior en mente examinemos la presente querella.

III.

La prueba de cargo descansó esencialmente en el testimonio de Pietri. Su historial delictivo, si bien debe considerarse al evaluar sus declaraciones, no es determinante *per se*. De igual modo, el hecho de que se trate de un único testimonio no conduce necesariamente a

la conclusión de que debe descartarse. Supone ponderar otros factores que permitan determinar su confiabilidad.

La Comisión de Disciplina Judicial era plenamente consciente de su responsabilidad probatoria en la presente querella. Al destacar su delicada función en este ámbito expresó en su Informe:

> La Comisión escuchó la prueba testifical muy consciente de que era determinante en un caso de esta naturaleza. Las teorías fácticas de ambas partes apuntaban hacia una inevitable adjudicación sobre la credibilidad de los testigos los cuales incluían a un convicto por narcotráfico, [al] propio Querellado, [a] funcionarios de la rama judicial y [a] peritos reconocidos.

Inmediatamente citó nuestras expresiones en *Ortiz v. Cruz,* 103 D.P.R. 939, 947 (1975), en donde expresamos:

> 'La verdad es que el testigo debe ser oído, y visto, interrogado y mirado.' Así se expresa el eminente procesalista Carnelutti en su obra *Rivista di Diritto processuale civile*, año 1929. Don Alfonso de Paula Pérez, *La prueba de testigos en el proceso civil español* (ed. Reus, Madrid, 1968, pág. 7), añade: 'y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación.' *Id*, en la pág. 947.

Al evaluar los testimonios, la Comisión de Disciplina Judicial dio crédito al testimonio de Pietri. Nuestra

evaluación de la transcripción de la prueba nos mueve a avalar su criterio.

Al hacerlo sopesamos el hecho de que Ruiz Rivera intervino en una vista de determinación de causa contra Pietri y la esposa de éste, y que otros testigos refutaron las declaraciones del principal testigo de cargo. Sin embargo, estos factores no nos mueven a alterar el criterio de la Comisión.

Aunque la defensa ha sostenido que el testimonio de Pietri no debe ser creído porque Ruiz Rivera tomó una determinación que le fue adversa en un caso previo, no nos parece que la mera determinación de causa probable en una vista preliminar haya motivado una faena de desprestigio insistente por parte de aquél contra éste. Se trata de una persona que ha tenido conflictos con la justicia, tanto en los tribunales de Puerto Rico como en los de Estados Unidos. No nos parece creíble que de todos los funcionarios del orden público que han intervenido con él, (jueces, fiscales y policías), Pietri haya optado por iniciar una campaña de descrédito contra el magistrado que le determinó en vista preliminar causa para iniciar un juicio que nunca se celebró, pues eventualmente el caso penal se archivó. Si bien el testimonio de Pietri debe ser visto con cautela, no creemos que deba ser descartado totalmente por ese sólo hecho a base de conjeturas.

Tampoco nos parece que las alegadas contradicciones entre el testimonio de Pietri y el de los otros testigos

de defensa deban tener el efecto de descartar como creíble las imputaciones de aquél, según sostiene el imputado.

Debe destacarse que algunas de las alegadas declaraciones contradictorias fueron prestadas por personas a quienes Pietri acusa de haber consumido sustancias controladas con él. Por lo tanto, se trata de personas cuya reputación se hubiese visto afectada si confirmaban el testimonio de Pietri. Por ello, resultaba lógico, e incluso previsible, que declararan que el alegado consumo de cocaína nunca ocurrió.

Las otras posibles contradicciones relacionadas con ese primer encuentro, --particularmente en cuanto al grado de iluminación del estacionamiento del "Hollywood Café", y la controversia en torno a la presencia de guardias privados en el local en donde ocurrió-— no nos parecen significativas, pues no inciden sobre la veracidad del testimonio central.

Por su parte, la prueba testifical no revela que el testimonio de Pietri relacionado al encuentro entre éste y Ruiz Rivera en la cafetería "La Bodeguita" haya sido contradicho por testigo alguno. Al analizar la transcripción de la prueba oral notamos que los testigos de defensa sólo narraron que el día del alegado encuentro entre Ruiz Rivera y Pietri, aquél les expresó que se encontraba incómodo por la presencia de éste en el lugar. De este modo, las declaraciones vertidas en el proceso disciplinario consisten esencialmente en una repetición de lo que el propio Ruiz Rivera les dijo en "La Bodeguita".

Al respecto, el dueño del local, señor Ángel Pellitsia, declaró que "[e]l señor Juez estaba almorzando en el negocio […], se paró <u>y me dijo</u> que se iba porque había una persona allí que no le agradaba su presencia por entender que era una persona de un pasado nebuloso". Transcripción de la prueba oral, en la pág. 310 (subrayado nuestro). De igual modo, el testimonio del licenciado Juan E. Medina Quintana versa sobre lo que escuchó decir al juez al salir del local; en específico, sobre la incomodidad que éste expresó sentir por la presencia de Pietri. *Id.*, en la pág. 405.

La contradicción, de haberla, consistiría entre lo que Pietri declaró y lo que el querellado Ruiz Rivera dijo al dueño de "La Bodeguita", no entre lo que Pietri dijo y lo que los testigos <u>observaron que ocurrió</u> en el lugar, pues éstos no narran incidente alguno que hayan visto que contradiga directamente lo dicho por Pietri. No hay, pues, contradicción alguna.

Por otro lado, la defensa intentó demostrar con evidencia médica que Ruiz Rivera no era usuario de sustancias controladas. Distinto a la propuesta de la defensa, la prueba médica presentada solo revela que al momento de las evaluaciones a las que fue sometido Ruiz Rivera no existía evidencia de que hubiera consumido de sustancias controladas. Tampoco revelan si en los días especificados por Pietri, Ruiz Rivera en efecto las había consumido.

Superadas estas indagaciones, resolvemos que la prueba presentada satisface el quantum probatorio requerido para probar que Ruiz Rivera, siendo Juez Superior, consumió sustancias controladas.

No podemos pasar desapercibido el hecho de que el Informe de la Comisión fue avalado por ésta por unanimidad. Fueron sus integrantes quienes tuvieron oportunidad de evaluar de primera mano todos los testimonios vertidos y de ponderar las incongruencias. Luego de ello llegaron a la conclusión de que los hechos imputados fueron probados. Nosotros no intervendremos con esa determinación es ausencia de pasión, prejuicio, parcialidad o error manifiesto.

IV.

Las disposiciones éticas invocadas para el ejercicio de nuestra jurisdicción disciplinaria son los cánones I, X, XI, XXIV, y XXVI de los de Ética Judicial de 1977. 4 L.P.R.A. Ap. IV-A C. I, X, XI, XXIV y XXVI.

Con excepción del Canon X, que claramente es inaplicable al presente caso, según lo concluyó la propia Comisión de Disciplina Judicial, *véase, Informe de la Comisión,* en la pág. 13,[2] los demás cánones imputados en

---

[2] Este canon regula las actividades económicas de los jueces. Expresamente disponía:

Canon X

    a. El juez o la jueza no deberá prestar servicios extrajudiciales remunerados, excepto en actividades que no sean incompatibles con estos cánones y cuya prestación no afecte adversamente el

el primer cargo al momento de la ocurrencia de los hechos

disponían, en lo pertinente, lo siguiente:

*Canon I*

La fe de un pueblo en la justicia, como valor esencial de la democracia, debe ser mantenida por los tribunales a los más altos niveles de la responsabilidad pública.

En el ejercicio de su delicada función, aquellas personas llamadas a impartir

---

fiel y diligente desempeño de sus labores y funciones judiciales. El Juez Presidente o la Jueza Presidenta podrá discrecionalmente, mediante dispensa a ser solicitada anualmente, autorizar dichos jueces o juezas a prestar tales servicios extrajudiciales.

La fuente de dicha remuneración o la manera en que se hacen los pagos no debe dar base a la creencia de que se ejerce o pretende ejercer influencia indebida en el Juez o la Jueza. La remuneración recibida no debe exceder la que bajo iguales circunstancias correspondería razonablemente a una persona que no fuera miembro de la judicatura.

b. Todo juez o jueza deberá presentar anualmente, en o antes del 15 de marzo, un informe de divulgación de la actividad extrajudicial por la cual reciban remuneración, expresando la fecha, el lugar, el importe y el nombre de la persona jurídica que la satisfizo y de la actividad financiera suya y de su núcleo familiar, que cubra el año natural anterior. El Tribunal Supremo aprobará, mediante reglamento, las normas sobre el contenido de dicha información de divulgación, las personas y actividad que el mismo cubrirá y el acceso a dicha información. Los jueces o las juezas del Tribunal Supremo, del Tribunal de Circuito de Apelaciones y del Tribunal de Primera Instancia, someterán sus informes al Secretario o a la Secretaria del Tribunal Supremo. 4 L.P.R.A. Ap. IV-A C. X.

justicia, conscientes de la posición que ocupan en la sociedad y de la trascendencia de su misión, deben velar por que sus actuaciones respondan a normas de conducta que honren la integridad e independencia de su ministerio y estimulen el respeto y la confianza en la Judicatura.

**Canon XI**

La Jueza o el Juez no solamente ha de ser imparcial sino que su conducta ha de excluir toda posible apariencia de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias. […].

**Canon XXIV**

No es necesario ni deseable que la Jueza o el Juez viva en el aislamiento. Sin embargo, ha de ser escrupuloso en evitar actuaciones que razonablemente puedan dar lugar a la impresión de que sus relaciones sociales, de negocios, de familia o de amistad influyen en alguna forma en sus determinaciones judiciales.

[…].

**Canon XXVI**

Los anteriores cánones de ética judicial son normas mínimas de comportamiento que todo Juez y toda Jueza debe observar fielmente, tanto en su letra como en su espíritu, por ser consustanciales con el cargo judicial. Estos cánones no excluyen otras normas de conducta que también obligan al Juez y a la Jueza, que están establecidas por ley o que son inherentes al honor tradicional de la judicatura.

Nuestra evaluación de la prueba y de los cargos I y III nos convence de que los cánones precitados fueron violados. El primero de éstos, Canon I, es un llamado general a los jueces, pero de ineludible cumplimiento, que

procura que quienes imparten justicia fomenten con sus actuaciones públicas y privadas la estima pública en la judicatura. Su contenido general se complementa con el Canon XXVI el cual incorpora entre los deberes éticos de los jueces normas no explícitas, pero cuyo cumplimiento es consustancial al fortalecimiento de la confianza pública en la judicatura. Ambos cánones imponen a los jueces, de modo principal, el deber de cumplir con la ley, pues ésta es una norma ética básica cuyo cumplimiento no podemos evadir si pretendemos que otros la acaten.[3] *In re: González Acevedo y Pagán Pagán*, res. 20 de junio de 2005; 2005 T.S.P.R. 87; 164 D.P.R. ____ (2005). *Véase, In re: Ferrán Quintana*, res. 28 de junio de 2002, 2002 T.S.P.R. 93, 157 D.P.R. ___ (2002).

Por su parte, los Cánones XI y XXIV procuran, entre otras cosas, evitar que con sus actuaciones los jueces den la impresión de que actúan a base de consideraciones ajenas a la prueba que se presenta en los procesos judiciales. Al respecto, la relación de amistad entre Ruiz Rivera y el principal testigo de cargo, persona cuya conducta delictiva era conocida, así como ciertas expresiones de aquél hechas a éste y creídas por la Comisión de Disciplina Judicial, relativas a que en la vista preliminar que presidió contra Pietri, había mucha

---

[3] Los Cánones de Ética Judicial del 2005 establecen en su canon número I el deber ético de los Jueces de cumplir con la ley. *Véase, In re, Aprobación de Cánones de Ética Judicial de 2005,* res. 5 de abril de 2005; 2005 T.S.P.R. 39; 163 D.P.R. ___ (2005).

prueba pero que "había sacado a su esposa absuelta", promueven una impresión contraria a los valores que los precitados cánones de ética pretenden promover. Esas expresiones dan la impresión de que en sus determinaciones judiciales pueden mediar consideraciones ajenas a la prueba que le sea presentada.

Claramente, los referidos cánones fueron infringidos por Ruiz Rivera. No sólo violó la ley al consumir cocaína como concluyó la Comisión de Disciplina Judicial, sino que siendo Juez al momento de los hechos, lesionó la estima pública en la judicatura. Su conducta amerita la sanción más enérgica que pueda imponer este tribunal.

Por ello, decretamos la destitución del querellado de su cargo de Juez Superior. A tenor con ello, resulta innecesario considerar las demás violaciones éticas imputadas en los cargos segundo y tercero.[4]

Se emitirá la correspondiente sentencia.

---

[4] El segundo cargo imputado contra Ruiz Rivera se relaciona con una declaración jurada que otorgó ante el Juez Wilfredo Santos López, quien era su compañero Juez en la Región Judicial de Ponce. En la declaración, en esencia, Ruiz Rivera expresó conocer a una persona de nombre Orlando González, quien se dedicaba al negocio de hojalatería, y que su relación con éste era estrictamente profesional. La declaración jurada fue suscrita por Ruiz Rivera al advenir en conocimiento de que un funcionario había expresado que no le había solicitado una orden judicial para allanar el local de hojalatería de González porque el auto de aquél estaba siendo reparado en ese momento en dicho local. La declaración jurada así suscrita, concluyó la Comisión, no fue hecha por Ruiz Rivera en el desempeño de sus funciones judiciales, lo que violaba disposiciones reglamentarias de la Oficina de Administración de los Tribunales. Véase Resolución de 25 de febrero de 1982 y Memorando Núm. 62 de 15 de mayo de 1982.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

José A. Ruiz Rivera
Juez Superior
Tribunal de Primera Instancia          AD-2002-02
Sala de Ponce

SENTENCIA

San Juan, Puerto Rico, a 28 de junio de 2006.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, se destituye al licenciado José A. Ruiz Rivera del cargo de Juez Superior del Tribunal de Primera Instancia.

Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta disiente con opinión escrita. El Juez Asociado señor Rebollo López no interviene. El Juez Asociado señor Fuster Berlingeri no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

José A. Ruiz Rivera
Juez Superior
Tribunal de Primera Instancia        AD-2002-02
Sala de Ponce

Opinión disidente de la Jueza Asociada SEÑORA FIOL MATTA

San Juan, Puerto Rico, a 28 de junio de 2006.

Una mayoría de este Tribunal ha acogido la recomendación de la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces o Juezas del Tribunal de Primera Instancia y del Tribunal de Apelaciones (en adelante la Comisión) y ha resuelto destituir al Honorable José A. Ruiz Rivera de su puesto de Juez Superior. Es mi criterio que la prueba presentada en este caso no satisface el estándar de prueba clara y convincente establecido por las reglas de procedimiento aplicables y por nuestra jurisprudencia. Por esa razón, disiento.

I.

La Opinión Per Curiam resume adecuadamente los eventos procesales que llevaron a la eventual presentación de la querella que imputó al Juez Ruiz Rivera cargos por violación a los Cánones I, XI, XXIV y XXI de Ética Judicial. Sin embargo,

no analiza las evidentes contradicciones en la prueba recibida durante la vista evidenciaria, que apuntan a la mendacidad del testigo estrella de este procedimiento. Un estudio cuidadoso del informe y declaraciones juradas sometidos por la OAT, el informe de la Comisión, la transcripción de los procedimientos ante la Comisión, la prueba documental sometida y la demás evidencia e información existente en el expediente, confirma que ese testimonio no era confiable al grado que exige un procedimiento de esta naturaleza.

Admite la Opinión mayoritaria que la prueba de cargo descansó esencialmente en el testimonio de Frankie Pietri Sepúlveda, un narcotraficante convicto, que era conocido como tal, aún antes de su convicción, en el ambiente en el cual se desenvolvía el Juez Ruiz Rivera. Según la mayoría, el historial delictivo del testigo, "si bien debe considerarse al evaluar sus declaraciones, no es determinante *per se*. De igual modo, el hecho de que se trate de un único testimonio no conduce necesariamente a la conclusión de que debe descartarse. Supone ponderar otros factores que permitan determinar su confiabilidad." El problema estriba, precisamente, en que esos "otros factores" no permiten adjudicarle al testimonio del señor Pietri la confiabilidad necesaria para, sobre <u>su única base</u>, destituir a un miembro de la judicatura. Me explico.

II.

José A. Ruiz Rivera fue nombrado Juez Municipal el 25 de enero de 1990 y Juez Superior el 8 de noviembre de 1999. Antes de esta última designación, fue evaluado por la OAT el

11 de junio de 1999.  En dicha ocasión fue descrito como un juez "muy bien calificado".

El 30 de mayo de 1996 y el 14 de octubre de 1996, el Juez Ruiz Rivera presidió dos vistas preliminares contra el Sr. Frankie Pietri Sepúlveda (en adelante Pietri) y la esposa de éste. Las imputaciones se relacionaban con la Ley de Sustancias Controladas, la Ley de Armas y el Código Penal de Puerto Rico. En la vista del 14 de octubre de 1996 el Juez Ruiz Rivera determinó causa probable contra Pietri, pero archivó la acusación contra su esposa.  No se solicitó vista preliminar en alzada contra la esposa de Pietri.

El Juez Ruiz Rivera y Pietri son, precisamente, los principales testigos ante la Comisión. Según sus respectivos testimonios, los hechos pertinentes a esta controversia ocurrieron durante el año 1996-97. En lo demás, según veremos, sus testimonios divergen sustancialmente. Cabe señalar que además del testimonio del Juez Ruiz Rivera, la parte querellada presentó otros testigos a los que nos referiremos según sea necesario.

1. **Versión del Juez Ruiz Rivera**:

El Juez Ruiz Rivera acostumbraba visitar el "Hollywood's Café" (en adelante el Pub), localizado en el pueblo de Ponce donde residía. En algunas ocasiones asistía sólo y en otras en compañía de su esposa. La Sra. Limarys Pacheco, dueña del Pub durante los años 1994 a 1998, era amiga del Juez Ruiz Rivera. Ambos fueron vecinos en el pasado. La Sra. Limarys Pacheco testificó que "en ocasiones sí le guardábamos estacionamiento a él [al Juez Ruiz Rivera] y él se estacionaba en el área del frente del negocio".[5] La

---

[5]    Transcripción de los procedimientos, vista del 8 de diciembre de 2003, en la pág. 214.

señora Pacheco también declaró que en el local tenían seguridad privada y que en el estacionamiento "el área del frente [era] muy alumbrado, teníamos unos focos sumamente grandes que [sic] era muy claro el lugar y siempre se mantenía un guardia de seguridad en el área del frente y uno en el área de atrás".[6] Según la dueña, las personas que frecuentaban el lugar eran lo que "nosotros llamamos el joven adulto, el profesional...."[7]

Una noche el Juez Ruiz Rivera acudió al Pub junto a su esposa y en un aparte fue a saludar a Octavio González (en adelante Octavio). Octavio trabajaba en un banco hipotecario y era amigo del Juez Ruiz Rivera. Octavio estaba hablando con Pietri. El Juez se acercó y Octavio, como acepta Pietri en su testimonio, le presentó a Pietri como estudiante de medicina[8]. Según el Juez Ruiz Rivera, "hablé par de palabras pues lo que uno puede hablar usual con una persona que la acaban de presentar y me voy para mi mesa con mi esposa".[9]

Según relató el Juez Ruiz Rivera, el segundo encuentro con Pietri fue en la casa del Juez. En una ocasión en que el Juez Ruiz Rivera estaba lavando el carro en la marquesina de su casa, Pietri se apareció vestido de una manera que "dictaba [sic] mucho del estudiante de medicina que me habían presentado". El Juez Ruiz Rivera continuó declarando:

> [E]ntonces él me dice en ese momento que tiene, que estaba dando una vuelta porque él tenía una

> amistad en la urbanización y que estaba visitándolo.... Y ya yo estaba un poquito molesto

---

[6]     *Id.* en la pág. 211.

[7]     *Id.* en la pág. 209.

[8]     Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 74.

[9]     Transcripción de los procedimientos, vista del 18 de diciembre de 2003, en la pág. 333.

porque si yo vivo en un sitio de acceso... en un lugar de acceso controlado, para aquel tiempo y ahora, es precisamente para eso, a mi me gusta el que llega a casa yo sepa quién va a llegar a casa ... me dice pues que llegó preguntando, que llegó preguntando y entonces me dice que él tiene un problema y que quiere a ver, a ver si yo lo puedo orientar sobre el problema que él tiene. Entonces me dice que su abogado es el Lcdo. Francisco León Sánchez y que él tiene un caso en el quinto piso del Tribunal, ya ahí la cosa entonces se vuelve un poquito más, más extraña para mí porque era de conocimiento público... casi el 100 por ciento de sus clientes [del Lcdo. León Sánchez] eran narcotraficantes.... Ahí pues ya yo molesto le digo, mire los Jueces no podemos estar dando orientación a nadie, o sea, los Jueces estamos impedidos, yo no debería estar hablando con usted en este momento. Yo lo que le recomiendo es que se vaya a donde su abogado y que su abogado lo oriente....[10]

Cabe señalar que el Juez Ruiz Rivera declaró que en la urbanización en que residía tenía como vecinos a un fiscal y a un compañero juez de la sala de lo criminal.

Posterior a este encuentro, el Juez Ruiz Rivera se comunicó con su amigo Octavio para contarle sobre lo sucedido e indagar sobre Pietri. Octavio le dijo que conoció a Pietri a través de Serafín Rosado. El Juez Ruiz Rivera se comunicó con Serafín Rosado, a quien conocía desde joven de la urbanización Las Delicias. Éste le dijo que sabía que Pietri andaba "en malos pasos de droga".[11] El testimonio del Sr. Serafín Rosado, agente de seguros para la época, confirmó lo declarado por el Juez Ruiz Rivera. Testificó el señor Rosado que conocía a Pietri de toda la vida. Declaró haberse encontrado con Pietri en el Pub. Durante el encuentro Pietri le dijo que estaba estudiando medicina. Rosado confirmó que él se lo presentó a Octavio esa misma

noche en el Pub y que el Juez Ruiz Rivera lo llamó en una ocasión para preguntarle sobre Pietri.

---

[10]     *Id.* en la pág. 336.

[11]     *Id.* en la pág. 338.

Resulta pertinente aclarar que el Juez Ruiz Rivera declaró que cuando le presentaron a Pietri en el Pub no recordaba que había presidido una vista preliminar contra Pietri y su esposa. Según el Juez Ruiz Rivera "eso no es nada que, el que está en Sala de lo Criminal sabe que eso no es nada extraño, o sea, yo veía una Sala de Vistas Preliminares que tenía 30 ó 40 Vistas Preliminares al día...".[12]

Como tercer encuentro, el Juez Ruiz Rivera declaró sobre el día que vio a Pietri en la Bodeguita del Medio en Ponce (en adelante la Bodeguita). Pietri entró al establecimiento poco después de que el señor Pellitzia, dueño de la Bodeguita, le había servido el almuerzo al Juez Ruiz Rivera. Relató el Juez Ruiz Rivera lo siguiente:

> Yo sabiendo lo que me había dicho Serafín, habiéndome él hecho lo que me hizo de llegar a casa, me levanto molesto y voy donde Pellitzia y le digo, 'mira cóbrame que me voy' y me dice, 'Juez qué le pasa usted no ha empezado a comer', y le digo 'porque ahí llegó una persona que me hizo un pocoverguenza [sic] y yo no me voy a quedar aquí'... me fui y no volví a saber de... de Pietri hasta el día que lo vi aquí. O sea, lo próximo que supe de Pietri fue todo este, esto que me ha imputado aquí.[13]

El señor Pellitzia testificó que la clientela de la Bodeguita era "altamente profesional, doctores,... abogados, licenciados, jueces,... Fiscales que iban del Tribunal, que estaba muy cerca, y profesionales del área que se reunían allí a almorzar".[14] Tanto el señor Pellitzia como el abogado Juan E. Medina Quintana, quien se encontraba ese día en la Bodeguita, confirmaron la versión del Juez Ruiz Rivera.[15]

---

[12]    *Id*. en la pág. 339.

[13]    *Id*. en la pág. 343.

[14]    Transcripción de los procedimientos, vista del 8 de diciembre de 2003, en la pág. 50.
[15]    *Id*. en la pág. 52-5.

**2. Versión del Sr. Frankie Pietri Sepúlveda:**

Al momento de la vista ante la Comisión, Pietri se encontraba confinado en una cárcel federal. Para la época de los hechos (1996-97) era narcotraficante, es decir, se dedicaba a la venta de drogas y controlaba varios puntos en residenciales del pueblo de Ponce. Testificó haber conocido a Octavio a través de un amigo de infancia que vivía en Las Delicias. Octavio trabajaba para un banco hipotecario y, según Pietri, lo estaba ayudando a conseguir un préstamo hipotecario para comprar una casa.[16]

Vio por primera vez al Juez Ruiz Rivera en el tribunal de Ponce. El Juez presidía una vista preliminar en la que encontró causa para acusar contra Pietri pero no contra su esposa. No se celebró vista en alzada contra su esposa. Luego de este suceso, Pietri conoció propiamente al Juez Ruiz Rivera una noche en Hollywood's Café. Testificó Pietri que acudió al Pub para reunirse con Octavio y discutir los trámites del préstamo. Esa noche, Octavio le presentó al Juez Ruiz Rivera. Estuvieron entre media y una hora en el Pub bebiendo y luego se dirigieron al estacionamiento. Se montaron en el carro de Octavio y se dieron "pases" de cocaína mientras el carro estaba estacionado. El Juez Ruiz Rivera se sorprendió cuando vio a Octavio darse un "pase" frente a Pietri pero Octavio le dijo: " no el muchacho es

cool, el muchacho es chévere, tú sabes no hay problema". Luego se marcharon en el auto de Octavio a dar vueltas por Ponce "como uno dice mareándose, estar dándose el pasecito tranquilo, se siente uno más, más tranquilo no hay tanta gente".[17] Regresaron al

---

[16] Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 24-24.
[17] *Id.* en la pág. 35.

estacionamiento del Pub y cada uno se fue en su carro. Según Pietri, en esa ocasión no se habló nada sobre la determinación de causa en su contra por parte del Juez Ruiz Rivera e "incluso para mi pensar [dice Pietri] yo era una persona común para él tú sabes".[18] Sin embargo, como veremos más adelante, Pietri testificó que el día en que fueron juntos a "Coaches", en el trayecto de San Juan a Ponce, el Juez Ruiz Rivera le dijo que lo había reconocido desde el primer día.

El testimonio de Pietri sobre lo sucedido en el Pub también contradice lo que había informado en su deposición ante la OAT. En la deposición Pietri indicó haber visto a Octavio darse un "pase" en el Pub, no así al Juez Ruiz Rivera. Específicamente, declaró que "Octavio se lo dio, pero yo no ví a Puruco [el Juez Ruiz Rivera] que se dio el pase en el Pub."[19]

El segundo encuentro con el Juez Ruiz Rivera, según Pietri, fue en la Bodeguita del Medio. "Yo lo vi y me le acerqué y lo saludé y ahí fue que me dijo, 'mira vamos a reunirnos más a menudo vamos' y yo, 'sí sí vamos a reunirnos' y él me dio los números de teléfono de la casa,

del celular y el de la oficina y todo eso y planificamos... los apunté en una libretita que yo tenía."[20]

La libreta de teléfonos de Pietri fue sometida en evidencia como Exhibit 4 de la parte Querellante. Según el expediente, de los números allí apuntados bajo el nombre de

---

[18]    *Id*. en la pág. 38.

[19]    Declaración Jurada ante la OAT, 8 de febrero de 2002, en la pág. 16.

[20]    Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 37.

"Puruco", que era el apodo del Juez[21], el único que efectivamente era de éste era el de la oficina. Este era el número de la secretaria del Juez Ruiz Rivera.[22] A requerimientos de la Comisión[23] se sometió en evidencia la Certificación del Sr. Carlos R. Torres Acevedo, investigador

del Departamento de Servicios de Seguridad de la Puerto Rico Telephone Company (Exhibit 7, Querellada). Mediante este documento se certificó que el número que Pietri identificó como el de la casa del Juez Ruiz Rivera corresponde al número telefónico del banco hipotecario para el cual trabajaba Octavio Rodríguez. Por otro lado, durante el periodo para el cual la Telefónica emitió su certificación (desde el 5 de agosto de 1997

---

[21]     Respecto al nombre de "Puruco", Pietri declaró: "... después de un tiempo que estuvimos en comunicación, establecimos una amistad, entre comillas, eh, me dijo mira no me llames señor Ruiz llámame 'puruco' que los amigos, que yo considero mis amigos me dicen 'puruco'". Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 30. Sin embargo, el Juez Ruiz Rivera declaró no saber cómo Pietri sabe de su apodo porque: "En mi pueblo las personas de mi familia principalmente me dicen 'puruco'. Mi esposa que lleva conmigo 17 años me dice José. A mí me dicen 'puruco' personas de Adjuntas de cuando yo era joven allá en Adjuntas me dicen 'puruco'..." Transcripción de los procedimientos, vista del 18 de diciembre de 2003, en la pág. 356.

[22]     El Exhibit 1 es una certificación de la Sr. Blanca E. Medina Bermúdez, Directora Ejecutiva Regional para el Tribunal General de Justicia, Región Judicial de Ponce, fechada el 22 de julio de 2002. Esta certificación reza de la siguiente forma:

> Certifico que conforme a los récords existentes en la Oficina Administrativa el Hon. José A. Ruiz Rivera estuvo asignado a la Oficina 401 de este Centro Judicial como Juez de Distrito durante el período comprendido del 12 de septiembre de 1995 hasta el 20 de agosto de 1997. Esta información se desprende de lo siguiente: El teléfono 841-4380 pertenece a la oficina 401. Mediante carta de fecha 12 de septiembre de 1995 se asignó a la Sra. Carmen N. Criado Criado como encargada del mismo. La señora Criado Criado fue asignada secretaria particular del Juez Ruiz Rivera desde el 1ro. de octubre de 1992 hasta el presente. El 20 de agosto de 1997 se asignó a cargo del teléfono 841-4380 a la Sra. Carmen Torres Negrón.

[23]     Orden del 4 de diciembre de 2003.

hasta el 20 de noviembre de 2003) el alegado número de celular del Juez no corresponde con su nombre ni con el de su esposa.[24]

Al examinar la libreta de teléfonos de Pietri se observa que los tres números están en las páginas correspondientes a las letras "Q,R". Justo al lado aparece escrito el nombre "Puruco" y "Jose" entre paréntesis. Se percibe claramente que ambos nombres y los números que, según el testimonio de Pietri, corresponden al de la casa y al celular del Juez están escritos en una misma tinta, mientras que el número de la oficina aparece en tinta diferente. Ello parece indicar que fueron copiados en momentos distintos, contrario a lo testificado.

En cuanto al tercer encuentro, según Pietri, éste surgió por invitación suya al Juez Ruiz Rivera. Durante el directo, Pietri testificó que llamó por teléfono al Juez Ruiz Rivera para dar una vuelta. Al ser contrainterrogado por el licenciado Ortiz Álvarez, abogado del Juez Ruiz Rivera, Pietri declaró creer haber llamado al Juez Ruiz

Rivera a su casa y no a su oficina; señaló "[c]reo que lo llamé al de la casa, creo, que llamé a la casa... **[e]l que tengo en mi libreta...**" (énfasis nuestro). Pietri testificó, en el directo, que junto al Juez Ruiz Rivera, Octavio y los hermanos Rodney y Jessie Ortiz, decidieron ir hacia San Juan a un lugar llamado "Coaches". Pietri y el Juez Ruiz Rivera se fueron juntos en el carro del Juez Ruiz Rivera. Los demás se fueron en el carro de Octavio. Durante el camino hacia San Juan, Pietri y el Juez Ruiz Rivera se dieron "pases" de cocaína. A pesar de que Pietri

---

[24]    En la certificación de la Telefónica se hizo constar que "[n]o existe información adicional en nuestro sistema con relación a dichos números de teléfonos para el período del 1 de enero de 1989 al 4 de agosto de 1997, ni del 21 de noviembre de 2003 al 4 de diciembre de 2003". Certificación de la Puerto Rico Telephone, Co. expedida el 5 de diciembre de 2003.

testificó que él no era usuario de drogas, "pa' que él se sintiera confiado pues olíamos juntos, olía yo con él [refiriéndose al Juez Ruiz Rivera]."[25]

Al llegar a "Coaches" el Juez Ruiz Rivera se sintió incómodo porque según Pietri, "'Coaches' esta [sic] lleno de gente de clase, del ambiente de él[,] abogados, fiscales, alguaciles, agente[s] federales... pensaba que lo estaban viendo o algo así...."[26] Ante la incomodidad del Juez Ruiz Rivera, ambos se marcharon de "Coaches". De regreso a Ponce, según el testimonio de Pietri, el Juez Ruiz Rivera le dijo: "mira yo sabía quién eras tú lo que pasa es que yo no quise decirte nada, yo saqué absuelta a tu esposa porque yo sabía que tu esposa no tenía nada que ver en el caso, tuve que encontrarte causa a ti porque había demasiado de prueba en contra tuya...."[27]

El próximo encuentro, según el testimonio de Pietri, fue en la casa del Juez Ruiz Rivera. Pietri le llevó cocaína a la casa y el Juez Ruiz Rivera lo invitó a que se quedara para una barbacoa que tenía con la familia.[28] Pietri rechazó la invitación del Juez Ruiz Rivera porque no se sentía cómodo compartiendo en la casa de éste y con su familia. Pietri le entregó la droga y se marchó. Ante la Comisión, Pietri testificó que sabía donde residía el Juez Ruiz Rivera "[p]orque ya yo frecuentaba ahí, porque ahí yo tenía un amigo mío y ya sabía más o menos dónde era la residencia. Le pregunte [sic] a los muchachos dónde es, 'mira el señor Ruiz vive al final' y yo

---

[25]     Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 50.

[26]     *Id.* en la pág. 45.

[27]     *Id.* en la pág. 47.

[28]     *Id.* en la pág. 96.

llegué".[29] Sin embargo, en su declaración jurada ante la OAT, Pietri declaró que el Juez Ruiz Rivera le había dado la dirección cuando lo llamó para que le llevara cocaína a su casa y para invitarlo junto a su esposa a una "barbacoa" familiar. Según Pietri "[e]l me había dicho, cuando había hablado conmigo, me dijo que... sabe, la dirección verbalmente, cómo era".[30]

Este fue el último encuentro entre Pietri y el Juez Ruiz Rivera. Posteriormente Pietri fue encarcelado en la prisión federal.[31]

### III.

En el caso de autos la Comisión llegó a sus propias determinaciones de hechos basándose **"exclusivamente** en la evidencia presentada y admitida" según requiere la Regla 33 de las Reglas de Procedimiento para Acciones Disciplinarias, 4 L.P.R.A. Ap. XV-A, R.33 (énfasis nuestro).[32] En varias de estas

---

[29] *Id*. en la pág. 52.

[30] Declaración jurada de Frankie Pietri Sepúlveda ante la OAT, en la pág. 30.

[31] Según el testimonio de Pietri, éste fue sentenciado a nivel federal a cumplir diecinueve (19) años de cárcel. Sin embargo, por su cooperación con las autoridades federales, su sentencia fue reducida a diez (10) años de prisión. Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 58-59.

[32] Las Reglas de Procedimiento para Acciones Disciplinarias y de Separación por Razón de Salud de Jueces y Juezas del Tribunal de Primera Instancia y del Tribunal de Apelaciones de Puerto Rico quedaron derogadas al aprobarse mediante resolución de este Tribunal las Reglas de Disciplina Judicial, efectivas a partir del 1 de abril de 2005. Debemos señalar que la Regla 35 de las Reglas de Disciplina Judicial (cláusula transitoria) dispone:

> a. Todo caso que esté bajo investigación en la Oficina de Asuntos Legales al momento de entrar en vigor estas reglas, continuará con el procedimiento vigente a la fecha de la presentación de la queja y hasta la presentación del informe de investigación a la Comisión. Para las demás etapas del caso, regirá el procedimiento disciplinario establecido en estas reglas.
>
> b. **Los casos sometidos al Tribunal, en o antes de la vigencia de estas reglas, continuarán con el**

determinaciones de hechos la Comisión señaló no haberle otorgado credibilidad al testimonio del querellado, "ni a aquellos que intentaron corroborarlo". A raíz de ello la Comisión encontró probados los cargos imputados y recomendó la destitución del Juez Ruiz Rivera. Por las razones que explico a continuación entiendo que la Comisión erró al encontrar probados el primer y el tercer cargo según imputados.

Las Reglas de Evidencia aplicables a casos civiles rigen en los procedimientos ante la Comisión de manera supletoria. 4 L.P.R.A. Ap. XV-A, R.30. Aplicando las normas que se desprenden de la Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV, R.10, sobre evaluación y suficiencia de la prueba podemos decir que la evaluación de la prueba es un ejercicio cualitativo que implica "aquilatar el testimonio, para lo cual, por supuesto, hay que considerar la impugnación que sufrió el testigo, si alguna, la naturaleza creíble o inverosímil del testimonio y su comportamiento al testificar (demeanor)". II ERNESTO L. CHIESA, TRATADO DE DERECHO PROBATORIO 1231-32. Sobre la credibilidad e impugnación de testigos, la Regla 44(B)(1) señala que la credibilidad de un testigo puede ser impugnada o sostenida mediante el "[c]omportamiento del testigo mientras declara y la forma en que lo hace". 32 L.P.R.A. Ap. IV, R.44(B)(1). En otras ocasiones hemos expresado que la observación en este contexto es "el instrumento más útil para la investigación de la verdad", mientras que en otras ocasiones hemos comentado que "es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral

---

**procedimiento que regía a la fecha de la presentación de la querella o petición de retiro involuntario.** *Id*. (Énfasis nuestro).

de un testigo". <u>Ortiz v. Cruz Pabón</u>, 103 D.P.R. 939, 947 (1975); <u>Sanabria v. Sucesión González</u>, 82 D.P.R. 885, 993 (1961). El "demeanor", por lo tanto, es una pieza importante al evaluar la credibilidad de un testimonio. Sin embargo, no lo es todo al momento de hacer una determinación judicial.

Como bien señala la Opinión mayoritaria, el **quántum necesario** para probar los cargos imputados en estos procesos disciplinarios es el de prueba "clara, robusta y convincente". 4 L.P.R.A. Ap. XV-A, R. 31. Según el comentario a la Regla 31: **"El mismo precisa de un grado mayor que el requerido para casos civiles (preponderancia de la prueba) y menor al requerido en casos criminales para probar culpabilidad (más allá de duda razonable)"**. (Énfasis nuestro). Véase además, <u>P.P.D. v. Admor. Gen. de Elecciones</u>, 111 D.P.R. 199 (1981).

La función de "un criterio de prueba, en cuanto dicho concepto tiene cabida en la Cláusula del Debido Proceso y en la función de determinar los hechos, es la de 'instruir al juzgador sobre el grado de confianza que nuestra sociedad entiende que él debe tener en la corrección de sus conclusiones sobre los hechos para un tipo particular de adjudicación'… El criterio sirve para ubicar el riesgo de error entre los litigantes y para indicar la relativa importancia que la decisión final debe tener". *Id*. en la pág. 223 [citando a <u>Addington v. Texas</u>, 441 U.S. 418, 423 (1979)](citas omitidas). Por lo tanto, un estándar de prueba instruye al juzgador sobre el grado de efecto persuasivo que debe ofrecerle la evidencia recibida. El criterio de evidencia clara y convincente, específicamente, exige una alta probabilidad de la ocurrencia del hecho. 2 McCORMICK ON EVIDENCE § 339-340, en las págs. 421-8 (5ta ed. 1999); <u>P.P.D. v. Admor. Gen. de Elecciones</u>, *supra*.

Ante la Comisión, la parte querellante presentó los testimonios de Frankie Pietri Sepúlveda, Lcdo. Radamés Vega Rodríguez[33] y el Alguacil Leonardo Rosado Vega. El testimonio de Frankie Pietri Sepúlveda es la única prueba que de ser creída sostiene los cargos imputados. Por el contrario, la parte querellada presentó los testimonios de Limarys Pacheco Vélez, Sgto. Hilario Marrero Rivera, Agte. José A. Campos Camacho, Sr. Ángel Pellitzia, Sr. Octavio González Rodríguez, Sr. Serafín

---

[33]     Según Pietri, la primera persona a quien le contó su versión sobre el Juez Ruiz Rivera fue al fiscal Radamés Vega Rodríguez. Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 55-56. Según Vega Rodríguez, Pietri le contó sobre este particular cuando el Fiscal fue a la cárcel federal a entrevistarlo por "un caso de asesinato que ocurrió en el Residencial Lirios del Sur". *Id*. en la pág. 163. En el contra-interrogatorio se dijo:

> Lcdo. Fernández Nadal: "Y lo cierto y verdadero es que como cuestión de hechos en ese caso en específico el Confinado Pietri interesaba algún beneficio por esa participación, ¿eso es correcto?"
> Vega Rodríguez: "Bueno, en ese momento no se estaba hablando de eso en particular, obviamente el proceso es... entrevistar al confinado y entonces el trato se da obviamente dependiendo de lo que él pueda producir no".

> Lcdo. Fernández Nadal: "Exacto, que mientras más información él produzca mejor puede ser el trato o el acuerdo que Fiscalía le de a ese confinado, ¿eso es correcto?".
> Vega Rodríguez: "No necesariamente".
> Lcdo. Fernández Nadal: "No".
> Vega Rodríguez: "No necesariamente. Este puede haber una inmunidad total, puede haber una inmunidad parcial, todo depende, verdad, de lo que se acuerde entre el confinado y su abogado y la Fiscalía".
> Lcdo. Fernández Nadal: "Y puede haber un archivo de caso también".
> Vega Rodríguez: "Puede haberlo sí".
> Lcdo. Fernández Nadal: "Eso es parte de".
> Vega Rodríguez: "Podría haberlo".
> Lcdo. Fernández Nadal: "Y en este caso específicamente se llevó a un acuerdo con el confinado Pietri, eh, un convenio".
> Vega Rodríguez: "Eh, yo... si mi memoria no me falla creo que sí".
> Lcdo. Fernández Nadal: "Hubo un convenio".
> Vega Rodríguez: "Hubo un convenio".

*Id*. en la pág. 164-5.

Rosado González, Lcdo. Octavio Capó Pérez, Lcdo. Juan E. Medina Quintana, Dr. Carlos Carro Pagán, Dr. Arnaldo Cruz Igartúa, Dr. Edgar Domenech Facundo, Sr. Roberto Rentas Ramos, Sr. Wilson Almodóvar y el testimonio del propio querellado Hon. José A. Ruiz Rivera.

Sabemos que la evaluación de la prueba testifical "no es ejercicio cuantitativo —contar testigos o versiones de testigos— sino cualitativo, esto es, aquilatar el testimonio". CHIESA, *supra*, en la pág. 1231. Además, "un abogado, por ser abogado, no tiene que merecerle a un tribunal más crédito que el que pueda merecerle cualquier ciudadano." Cruz Ortiz v. Cruz Pabón, *supra*, en la pág. 946. Sin embargo, no podemos pasar por alto que las imputaciones del caso de autos se sostienen **únicamente** por el testimonio de un narcotraficante a quien el juez querellado le determinó causa para acusar en vista preliminar. Tampoco podemos pasar por alto los elementos contradictorios del  testimonio del señor Pietri Sepúlveda.

En respuesta a las declaraciones de Pietri, la parte querellada presentó el testimonio del Juez Ruiz Rivera. La versión del Juez Ruiz Rivera es diametralmente opuesta a la del señor Pietri y, **a diferencia de la versión de Pietri, gran parte de ésta fue corroborada por las declaraciones de otros testigos**. Lo ocurrido en el primer encuentro encuentro en Hollywood's Café), según relatado por el Juez Ruiz Rivera, coincide con las declaraciones de Serafín Rosado y Octavio González Rodríguez.  La dueña del Pub declaró sobre la iluminación en el estacionamiento del negocio y sobre la presencia de guardias de seguridad privada.  En cuanto al encuentro entre el Juez Ruiz Rivera  y Pietri en la Bodeguita, el relato del Juez coincide con lo declarado por el dueño del negocio, Ángel Pellitzia y por el Lcdo. Juan E. Medina,

quien alegadamente se encontraba en el lugar al momento de los hechos.

Sobre el alegado encuentro para ir a "Coaches", que según el Juez Ruiz Rivera nunca ocurrió, Pietri testificó que el Juez se sentía incómodo porque "'Coaches' esta [sic] lleno de gente de clase, del ambiente de él[,] abogados, fiscales, alguaciles, agente[s] federales... pensaba que lo estaban viendo o algo así...". Esta aseveración resulta contradictoria y difícil de creer si la evaluamos a la luz de los otros incidentes alegadamente ocurridos. Así, no es creíble que al Juez Ruiz Rivera le incomodara compartir en un ambiente nocturno en San Juan, donde un juez del área de Ponce fácilmente podría pasar desapercibido y donde con gran probabilidad no se conociera a Pietri; más sin embargo, podía compartir tranquilamente en negocios de Ponce concurridos por colegas del área, a plena luz del día como en la Bodeguita, y a tempranas horas de la noche como en Hollywood's Café, en compañía de alguien conocido por muchos como narcotraficante. Al respecto, el Sargento Hilario Marrero, testigo de la parte querellada, quien trabaja desde hace aproximadamente veinte (20) años en la División de Drogas y Narcóticos de la Policía de Puerto Rico en Ponce, declaró que sabía quién era Frankie Pietri porque "era un individuo de bajo mundo..., una de las personas más importantes en el tráfico de drogas en el área sur, que pertenecía a una ganga de las más poderosas que ha pasado en el área sur en unos años atrás".[34]

No debemos olvidar que según el testimonio de Pietri el Juez Ruiz Rivera lo reconoció desde el principio. Por lo tanto, si creemos dicho testimonio, debemos concluir que

---

[34]  Transcripción de los procedimientos, vista del 8 de diciembre de 2003, en la pág. 21.

durante todos los encuentros relatados por Pietri el Juez sabía que la persona con la que estaba socializando públicamente era un narcotraficante reconocido a quien él mismo le había determinado causa en vista preliminar.[35]

Con relación al encuentro en la casa del Juez Ruiz Rivera, la versión de Pietri resulta aún más difícil de creer. Según Pietri, el Juez Ruiz Rivera lo invitó a su casa para que le llevara cocaína **y de una vez se quedara para una barbacoa junto a su familia**. La prueba demostró que el Juez Ruiz Rivera vivía en una urbanización con acceso controlado y varios compañeros abogados e incluso jueces eran sus vecinos. Como sabemos, "[l]os jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería". Pueblo v. Luciano Arroyo, 83 D.P.R. 573, 582 (1961).

Por otro lado, la parte querellada presentó el testimonio de tres peritos médicos. Estos fueron: el Dr. Carlos José Carro Pagán, el Dr. Arnaldo Cruz Igartúa y el Dr. Edgard Domenech Pabón.  El Dr. Carro Pagán, cardiólogo, declaró que atiende al Juez Ruiz Rivera desde el 1990 porque "padecía de una serie de pulsos lentos"[36] y que no existe ningún indicio de que éste consuma cocaína u otra sustancia controlada. El Dr. Edgard Domenech Pabón, otorrino-laringólogo, cirujano bucal y Jefe del Departamento de Otorrinolaringología en el Hospital San Lucas "hizo una evaluación completa, no solamente eh, a nivel de examen físico, sino también del historial... ambas de ellas salieron

---

[35] Según citado anteriormente Pietri testificó que el Juez Ruiz Rivera expresó durante el camino de San Juan a Ponce lo siguiente:

> [M]ira yo sabía quién eras tú lo que pasa es que yo no quise decirte nada, yo saqué absuelta a tu esposa porque yo sabía que tu esposa no tenía nada que ver en el caso, tuve que encontrarte causa a ti porque había demasiado de prueba en contra tuya....

[36] Transcripción de los procedimientos, vista del 18 de diciembre de 2003, en la pág. 181.

completamente negativas". No procede descartar del todo este testimonio, si bien la evaluación del doctor Domenech fue el 25 de octubre del 2002 y, según su testimonio, la existencia de rastros por el uso de cocaína en el 1996 depende de la cantidad y frecuencia del uso de esta sustancia.

Por su parte, el doctor Cruz Igartúa, psiquiatra especializado en psiquiatría de las adicciones, testificó que el 25 de junio de 2003 comenzó un proceso para evaluar al Juez Ruiz Rivera. El doctor Cruz Igartúa condujo entrevistas con el Juez Ruiz Rivera y su esposa, y llevó a cabo una serie de pruebas psicológicas, psiquiátricas y toxicológicas, entre otras. En resumen declaró:

> Yo lo que puedo decirle de toda esta evaluación es que en el momento presente no hay indicador alguno que el señor Ruiz Rivera tenga problema alguno de uso de sustancia alguna, incluyendo legales, sustancias legales como alcohol. Eso es lo que yo puedo declarar y que, **y que eso hace bien, hace improbable, vamos a ponerlo así, que lo haya tenido anteriormente...**(énfasis nuestro).[37]

Por último tenemos que hacer referencia a la falta de correspondencia entre los números telefónicos del Juez Ruiz Rivera y los que Pietri tenía en su libreta de teléfonos y que alegadamente eran del Juez, pero según la prueba no lo eran, a excepción del de su oficina, que podía obtenerse fácilmente de la guía telefónica.[38] La prueba documental no corroboró estas alegaciones de Pietri, más bien levantó serias dudas al respecto, dudas que se extienden entonces a su versión del encuentro en la Bodeguita del Medio, donde alegadamente obtuvo la información.

---

[37]    *Id.* en la pág. 264.

[38]    Transcripción de los procedimientos, vista del 4 de diciembre de 2003, en la pág. 132.

La Regla 35 de las Reglas para Acciones Disciplinarias, 4 L.P.R.A. Ap. XV-A, R. 35, dispone:

> (b) Si el tribunal determina que los cargos en que está fundamentada la querella, o parte de ellos, han sido probados y ello acredita conducta que amerite acción disciplinaria, procederá a imponer al juez o a la jueza, conforme a la naturaleza de éstos, la correspondiente sanción o medida remediativa. Esta podrá ser la recomendada por la Comisión u otra que el tribunal determine… (c)… (d) Si, por el contrario, el tribunal considera que
>
> los cargos de la querella o las alegaciones de la petición de separación no han sido acreditados, adoptará la recomendación de la Comisión si ésta fuera desestimación y archivo, y si no, lo ordenará así motu proprio. 4 L.P.R.A. Ap. XV-A, R. 35.

Esta disposición nos permite extender a las acciones disciplinarias contra jueces las mismas expresiones que hemos adoptado para las determinaciones de comisionados especiales en los casos de disciplina profesional contra abogados y notarios. En dichos casos hemos explicado:

> [C]uando una querella se ventila ante un Comisionado Especial, aunque nuestra tendencia general es a no alterar las determinaciones de hechos que éste emita, **este Tribunal no está obligado a aceptar sus recomendaciones.** Al evaluar la adopción de los hallazgos del Comisionado Especial, consideramos esencialmente si dichas determinaciones están sostenidas por la prueba testifical y documental. Conforme a dicha evaluación, **podemos adoptar el mismo, modificarlo e inclusive rechazarlo, aun en ausencia de pasión, prejuicio, parcialidad o error manifiesto".** In re Deynes Soto, res. el 23 de marzo de 2005, 163 D.P.R. ___ (2005), 2005 T.S.P.R. 51 [enmendada *nunc pro tunc* mediante resolución del 22 de abril de 2005, 2005 T.S.P.R. 51](citas omitidas)(énfasis nuestro).

En el caso de autos, la versión de Frankie Pietri Sepúlveda no es persuasiva y la prueba cuidadosamente examinada no es convincente. El testimonio de Pietri contiene muchas e importantes contradicciones y entiendo que como única prueba para sostener tan delicadas imputaciones, ésta no provee el grado de confianza requerido por el estándar de "prueba clara y convincente". Después de todo, un buen "demeanor" al testificar, no puede hacer creíble lo

increíble. No es altamente probable que los hechos hayan ocurrido según relatados por el señor Pietri. No podemos perder de vista que la destitución de un juez destruye su reputación como ser humano y ésta es difícil de recobrar. Resolvería que la Comisión erró en la apreciación de la prueba y, por consiguiente, ordenaría la desestimación y el archivo del primer y tercer cargo.

                                    VI.

Examinemos ahora el segundo cargo imputado al Juez Ruiz Rivera. La Comisión le imputó la violación a las normas establecidas en la resolución del Tribunal Supremo del 25 de febrero de 1982[39] y el Memorando Núm. 62 de 15 de marzo de 1982 preparado por la O.A.T. Estas directrices impiden a los jueces intervenir con su firma y sello en los negocios jurídicos de naturaleza privada "a no ser que se trat[e] de aquellos que vayan a surtir efecto en un procedimiento judicial".[40]

En el caso de autos, el Juez Ruiz Rivera hizo una declaración de autenticidad juramentada ante el Hon. Wilfredo Santos López, Juez del Tribunal de Primera Instancia del Distrito Judicial de Ponce (Exhibit 3, Querellante). Aunque en la misma afirma hacerlo "en desempeño de la función de Juez de la Sub-Sección de Distrito del Tribunal de Primera Instancia", su contenido se refiere al conocimiento que tiene de una persona (Sr. Orlando González) dedicada al oficio de "hojalatería" y su relación "estrictamente" profesional con ésta. Negó a su vez haber expedido orden de allanamiento o registro dirigido al lugar donde ubica el taller de hojalatería perteneciente al Sr. Orlando González.

---

[39] Resolución sobre el alcance de la facultad de los jueces para autorizar afidávits o declaraciones de autenticidad.

[40] Resolución del Tribunal Supremo de 25 de febrero de 1982, en la pág. 3.

El Juez Ruiz Rivera alegó que decidió hacer esta declaración de autenticidad debido a unos comentarios que habían llegado a su conocimiento y que, a su juicio, ponían en entredicho su integridad como juez. Según los comentarios, un funcionario no acudió al Juez Ruiz Rivera para solicitar la expedición de una orden de allanamiento contra el taller del Sr. González porque sabía que el Juez tenía su carro en reparación en dicho taller. El Juez Ruiz Rivera también alegó que hizo la declaración ante el Juez Wilfredo Santos López porque se sentía "incómodo" haciéndola frente a un abogado privado.

La declaración fue enviada a la Jueza Administradora de la Región Judicial de Ponce el mismo día que fue otorgada, es decir, el 17 de diciembre de 1997, aunque aparece erróneamente identificada como suscrita el 24 de diciembre de 1997. La declaración de autenticidad enviada a la Jueza Administradora fue acompañada de una carta con membrete oficial del Tribunal General de Justicia. En esta carta el Juez Ruiz Rivera expresó, *inter alia*, su deseo de "despejar cualquier duda que pueda existir sobre su integridad moral, profesional y personal...." Debemos señalar que al pie de la página tercera de la declaración de autenticidad aparece una anotación de la Hon. Elba Rosa Rodríguez, Jueza Administradora de la Región Judicial de Ponce, donde indica lo siguiente: "¿Quién es este notario. ¿Por qué sello del Tribunal? ¿Con qué propósito hizo esta declaración... no surge otra inf....[sic] ¿Se puede localizar la dirección de Orlando González para citarlo...."

La prohibición a los jueces de utilizar su firma y sello en negocios jurídicos de naturaleza privada responde

al Canon IX de Ética Judicial, que prohíbe a los jueces el ejercicio de la abogacía "que incluye la notaría". 4 L.P.R.A. Ap. IV-A, C.IX. Esta prohibición no se extiende a las funciones de autenticación y autorización de documentos que surten efecto en los procedimientos judiciales. Éstos tienen carácter público y, por consiguiente, son permitidas por el Canon X y por la prohibición análoga contenida en la Ley de marzo de 1908, según enmendada. 4 L.P.R.A. § 890. Hernández v. Rosado, 22 D.P.R. 387 (1915); López v. Meléndez, 22 D.P.R. 156 (1915). La autoridad que para tomar declaraciones juradas o affidávits confiere la referida ley a los jueces es una facultad consustancial al descargo de la función judicial, a ser utilizada únicamente en aquellas ocasiones en que el affidávit o declaración de autenticidad va a surtir efecto en un procedimiento o acción ante cualquier tribunal de justicia. Resolución del Tribunal Supremo de 25 de febrero de 1982.

Conforme a la normativa vigente, este Tribunal dictó resolución el 25 de febrero de 1982 regulando el alcance de la facultad de los jueces para autorizar declaraciones de autenticidad. En lo concerniente, esta resolución dispone:

> Ciertamente, la autenticación de firmas en contratos y solicitudes de licencias de diversos tipos, y **las declaraciones juradas de interés privado, caen fuera del marco de autorización** de la Ley de 12 de marzo de 1908 y, por consiguiente, no pueden ser hechas por los jueces del Tribunal General de Justicia. Tales declaraciones o afidávits, aun cuando sean para utilizarse ante otras agencias del gobierno, no son incidentales al descargo de la función judicial ni al trámite de acciones o procedimientos ante los tribunales.
>
> En consecuencia resolvemos que ningún juez del Estado Libre Asociado de Puerto Rico puede autorizar afidávits o declaraciones de autenticidad que involucren un **mero interés privado o particular** –área que está reservada para los notarios– a no ser que se trate de las declaraciones que vayan a surtir efecto en un procedimiento judicial.

El Memorando Núm. 62 de 15 de marzo de 1982 simplemente comunica a los jueces y secretarios de los tribunales lo

emitido por el Tribunal Supremo en la resolución del 25 de febrero de 1982.

Violar esta normativa implica actuar en contravención al Canon XXVI. Este canon advierte:

> Los anteriores Cánones de Ética Judicial son normas mínimas de comportamiento que todo Juez y toda Jueza debe observar fielmente, tanto en su letra como en su espíritu, por ser consustanciales con el cargo judicial. Estos cánones no excluyen otras normas de conducta que también obligan al Juez y a la Jueza, que están establecidas por ley o que son inherentes al honor tradicional de la judicatura. 4 L.P.R.A. Ap. IV-A, C.XXVI.

Este Canon XXVI hace aplicable a los jueces "cualesquiera otras normas de conducta que en alguna forma salvaguarden la dignidad del cargo y la independencia judicial". Torres Torres, *supra,* en la pág. 27.

Resulta forzoso concluir que el Juez José A. Ruiz Rivera actuó en contravención a la reglamentación vigente, al gestionar que otro juez emitiera la declaración de autenticidad señalada. Dicha conducta, a su vez, constituyó una violación al Canon XXVI de Ética Judicial. Coincido con la Comisión en cuanto a esta determinación.

La violación de las normas administrativas que reglamentan la actividad de los jueces y juezas puede conllevar también violaciones a los Cánones de Ética Judicial. In re Ferrán Quintana, *supra*. Las normas disciplinarias deben ser interpretadas de forma rígida y, por la naturaleza de su ministerio, los miembros de la judicatura deben imponerse "restricciones en cuanto a su conducta que podrían verse extremadamente pesadas por cualquier ciudadano común". Torres Torres, *supra*, en la pág. 7.

El Juez Ruiz Rivera no autorizó la declaración de autenticidad aquí cuestionada, sin embargo, ocupando el cargo de Juez, le solicitó a otro juez que la autorizara, para su beneficio personal. La prohibición contenida en la normativa antes discutida, por sus propios términos, está dirigida al juez o jueza que autoriza la declaración de autenticidad. Es evidente, sin embargo, que se extiende también al juez que acude a otro magistrado para que le tome juramento o le autorice la declaración de autenticidad.

El Juez Ruiz Rivera argumentó que no se trataba de una declaración de autenticidad que perseguía un mero interés particular o privado, pues su comparecencia se debió únicamente a su interés por aclarar y evitar empañar unos procesos judiciales. Estas alegaciones son incorrectas. Una lectura integral del documento en controversia, así como de la carta que lo acompaña, refleja que el verdadero propósito de la declaración fue proteger el interés privado del querellado. Al tener como objetivo salvaguardar la "integridad moral, profesional y personal" del querellado, la declaración se alejó del interés público que tutela la norma en controversia.

Por tal razón, el segundo cargo fue probado. Resolvería, sin embargo, que la falta cometida no requiere sanción adicional, pues al haber estado relevado de sus funciones desde el año 2002, el Juez Ruiz Rivera ha satisfecho la penalidad que hubiéramos impuesto en otras circunstancias.

Por los fundamentos antes expuestos ordenaría la reinstalación del Hon. José A. Ruiz Rivera a sus labores como Juez Superior del Tribunal de Primera Instancia.


                              Liana Fiol Matta
                              Jueza Asociada