EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PEDRO LUCIANO ARROYO, C/P PELLIN, acusado y apelante.

*Número:* 16918. *Resuelto:* 27 de septiembre de 1961.

*Yamil Galib Frangie* y *Luisa María Capó*, abogados del apelante; *J. B. Fernández Badillo*, Procurador General de Puerto Rico, y *Héctor R. Orlandi Gómez*, Procurador General Auxiliar, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Pedro Luciano Arroyo fue convicto de una infracción a la ley Núm. 220 de 15 de mayo de 1948, conocida como "Ley de Bolita." Apela y le imputa varios errores al tribunal sentenciador, todos relacionados con la orden de allanamiento. Alega que la declaración jurada que sirvió de base a la orden contenía hechos falsos y que dicha falsedad le constaba al

declarante. En dicha declaración, el agente Julio Acevedo manifiesta que el día 24 de septiembre de 1959, en horas de la tarde, mientras pasaba junto a la casa del querellado "vi un hombre grueso y de mediana edad que estaba parado en el balcón de dicha casa y tenía en las manos gran cantidad de boletos de bolipool los cuales contaba y cotejaba y al notar mi presencia rápidamente se entró para la casa cerrando la puerta". En la vista sobre la moción de supresión de evidencia, el agente admitió que en otras tres declaraciones juradas firmadas por él durante el año anterior y relacionadas con casos de "bolita", había hecho manifestaciones similares a las arriba copiadas.

Su declaración sobre este asunto, transcrita a la letra, es la siguiente:

"P.—Testigo, ¿y esa es la primera vez que le ha pasado a usted eso; que va caminando y ve a una persona bregando con bolipool en el balcón de una casa y se mete para adentro y usted no ha podido hacer nada?

R.—Yo he cogido bolita en la calle. No es lo mismo en la calle que una casa.

P.—Si es la primera vez que usted ve una persona en un balcón bregando con bolipool?

R.—Me ha pasado distintas veces.

P.—Testigo, ¿alguna vez ha pedido usted una orden de allanamiento alegando eso mismo: que ha visto a un hombre bregando con bolipool, o una mujer; y se ha metido para adentro y ha pedido orden de allanamiento?

R.—La he pedido.

P.—Cuántas órdenes de allanamiento usted recuerda haber pedido durante el último año fiscal?

R.—Me parece que como tres.

P.—Mire a ver si fueron las siguientes: Mire a ver si usted recuerda haber pedido una orden de allanamiento para allanar una casa de Conrado Rodríguez Ramos...

R.—Sí, señor.

P.—Mire a ver si en la declaración jurada que usted prestó para allanar la casa de Conrado Rodríguez Ramos, usted aseveró que el catorce de julio de mil novecientos cincuenta y nueve

usted vio una señora trigueña, como de cuarenta años, de estatura regular, apartamiento de concreto número 46, caserío del barrio Sábalos, que estaba bregando con material de bolita y al notar su presencia se metió para dentro de la casa.

R.—Sí, señor.

P.—Testigo, mire a ver si también en el caso de Nicolás López Feliciano pidió usted una orden de allanamiento alegando que en treinta y uno de mayo de mil novecientos cincuenta y nueve, en horas de la tarde, mientras usted estaba haciendo un recorrido, vio a un hombre blanco, grueso, como de cuarenta y cinco años, bregando con bolipool en un balcón y al notar su presencia se metió para adentro de la casa, en la calle Mariano Abril número 89.

R.—Sí, señor.

P.—Testigo, mire a ver si en el caso de Ignacio Cruz Valentín usted prestó una declaración el día veintiuno de julio de mil novecientos cincuenta y nueve, como a las dos de la tarde, alegando que vio una señora negra, de bastante estatura, bregando con bolipool frente a la casa de Ignacio Cruz Valentín y al notar su presencia cerró la puerta. En el barrio Algarrobo, sitio Las Caiseas.

R.—Sí, señor

P.—Testigo, mire a ver si es o no cierto que esa es una forma que usted usa para poder conseguir orden. de allanamiento, cuando recibe confidencias o informaciones. Si eso mismo lo vacía en todas las declaraciones para en esa forma proceder al registro.

R.—No, señor. Eso no es verdad.

P.—Entonces le pregunto: ¿Sabe quién es esa señora trigueña, de cuarenta años, que entró a la casa de Conrado Rodríguez Ramos el catorce de julio de mil novecientos cincuenta y nueve? Si ya usted sabe quién es.

R.—No, señor.

P.—¿Hizo esfuerzo de alguna clase para saber quién es esa señora de cuarenta años, de estatura regular? Si ha hecho alguna gestión.

R.—No, señor.

P.—¿Ha investigado?

R.—No, señor.

P.—¿Y ese día usted no esperó que saliera esa señora trigueña de la casa?

R.—No, señor.

P.—¿En lo que a usted se refiere, esta señora ha podido seguir bregando con bolipool?

R.—Puede estar hasta que se sorprenda.

P.—¿Y este hombre blanco, grueso, de cuarenta y cinco años, que el treinta y uno de mayo de mil novecientos cincuenta y nueve entró a la casa de Nicolás López Feliciano, averiguó usted quién es ese hombre blanco, grueso, como de cuarenta y cinco años de edad?

R.—No, señor.

P.—¿No ha hecho gestión alguna para averiguar quién es ese hombre?

R.—No, señor.

P.—¿Alguna clase de investigación, alguna actividad para ver quién es ese hombre blanco?

R.—No.

P.—¿Ese día no permaneció usted en la calle Mariano Abril esperando que saliera ese hombre blanco, como de cuarenta y cinco años de edad, de la casa de Nicolás López?

R.—No, señor.

P.—¿Y la mujer negra, de bastante estatura, que el veintiuno de julio de mil novecientos cincuenta y nueve estaba frente a la casa de Ignacio Cruz; usted sabe quién es esa señora negra?

R.—Esa sé quién es.

P.—¿Podría decir usted cómo se llama?

R.—El nombre no se.

P.—¿Usted no sabe cómo se llama, ya que usted sabe quién es? ¿No sabe cómo se llama ella?

R.—No le voy a decir el nombre...

P.—¿No sabe el nombre?

HON. FISCAL:

El testigo dice que sabe quién es.

HON. JUEZ:

P.—¿Usted sabe el nombre?

R.—Yo sé el apodo; el nombre no.

LCDO. GALIB:

P.—¿Cuál es el apodo?

HON. FISCAL:

No conteste. Hemos visto que el testigo está renuente, no quiere decir el nombre de esa persona, y nosotros, en evitación de que pueda perjudicarse, nos vamos a oponer a que el testigo diga el apodo o el nombre de esa persona.

Hon. Juez:

Sin lugar.

Lcdo. Galib:

P.—¿Cuál es el apodo?

R.—El apodo es Tuta.

P.—¿Usted ha pedido orden de allanamiento contra Tuta?

R.—No, señor.

P.—¿Le ha comunicado usted eso a algún agente del orden público; ha dado cuenta en el libro de novedades del cuartel de la policía; ha dado cuenta al fiscal, o es ahora la primera vez que habla de Tuta?

R.—Yo hablo de ella porque usted me pregunta.

P.—Usted la vio el veintiuno de julio de mil novecientos cincuenta y nueve bregando con bolipool. Le pregunto si usted ha hecho alguna gestión para acusar a Tuta.

R.—No, señor.

P.—¿No ha hecho gestión ninguna?

R.—No, señor.

P.—¿Por qué?

R.—Pues no lo creí necesario. Yo la conozco así. No lo creí necesario. Además, después fue que yo averigué quién era y supe el apodo.

P.—¿Y ya usted sabe dóndo vive Tuta?

R.—Donde vive no.

P—¿Pero la ha visto después de eso?

R.—La he visto.

P.—¿Y no ha pensado ni en pedir orden de allanamiento, ni en prestar una declaración jurada haciendo constar que ha visto a esa Tuta bregando con boletos de bolipool?

R.—No, señor. Yo, sin embargo, pedí orden para allanar la casa de Ignacio Cruz Valentín porque ese ha sido convicto por bolipool; pero ella estaba en casa de Ignacio.

P.—Usted procedió contra Ignacio y contra Tuta no.... Mire a ver si es cierto o no es cierto que usted no ha prestado, durante el último año fiscal, ninguna declaración jurada pidiendo la expedición de una orden de allanamiento, en la cual haya alegado una cosa distinta a esta; que vi a alguien bregando con boletos de bolipool. Mire a ver si es o no es cierto que todas las declaraciones juradas dadas por usted durante el último año, todas ellas presentan la misma cuestión: alguien bregando con bolipool en el balcón de una casa.

R.—Sí. Son esos los únicos casos. No hay más nada.

P.—¿Quiere decir que ha dado la coincidencia que en todos ha ocurrido en esa misma forma?

R.—Bueno, más o menos.

P.—Por ejemplo, un caso: Un hombre blanco, grueso, de cuarenta y cinco años; otro caso, una señora trigueña, de cuarenta años; otro, una señora negra, de bastante estatura; y en este caso un hombre grueso, de mediana edad.

R.—Esos nada más.

P.—¿No ha habido cambio en esa forma?

R.—No ha habido.

P.—Ahora, ¿usted lleva cinco años trabajando en el Escuadrón contra el Vicio, aquí en Mayagüez?

R.—Sí, señor.

P.—¿Y su especialidad es contra la bolita?

R.—Sí, señor.

P.—Sin embargo en las últimas cuatro órdenes de allanamiento en que usted ha intervenido siempre han resultado personas desconocidas las que han estado bregando con bolipool; personas que usted no había conocido; gente nueva.

R.—Hay uno también.

P.—¿Y a pesar de usted haber seguido en ese servicio especial contra la bolita, y a pesar de que usted conoce cientos y cientos de personas, usted no ha conocido a estas cuatro personas objeto de las declaraciones, ni las ha vuelto a ver?

R.—Puede que las haya visto, pero no lo recuerdo."

En la vista sobre la moción de supresión de evidencia, el agente también manifestó que en la fecha antes indicada había pasado frente a la residencia del acusado ubicada a las afueras de Mayagüez porque iba a llevar un automóvil de la policía a ser engrasado en el garaje del gobierno cercano a dicha residencia. En una vista posterior sobre el mismo asunto, la defensa ofreció el testimonio del jefe de dicha dependencia gubernamental, quien con los registros correspondientes a mano, declaró que no existía constancia de que el mencionado automóvil hubiese sido engrasado o reparado en el garaje en la fecha indicada por el agente Acevedo. Explicó que en el garaje se lleva un Informe Diario de Lavado y Engrase de Vehículos y otro Informe Diario de Repara-

ciones y que en ellos no aparecía la indicada constancia. Sí aparecía una anotación sobre el mismo automóvil, pero se refería a una fecha varias semanas más tarde de la indicada por el agente Acevedo. Admitió el testigo que cuando se trataba de reparaciones sin importancia no se hacían anotaciones en los registros, pero eran cosas de "momento", y si se dejaba el automóvil, se le hacía la orden correspondiente.

El fiscal ofreció entonces el testimonio del Sargento Pedro J. Ramírez de la Policía, quien en síntesis declaró que el automóvil tablilla 101–109 estaba asignado al Escuadrón del Vicio de Mayagüez que él dirigía, que el 24 de septiembre de 1959 el automóvil tenía "un fallo" y Julio Acevedo lo llevó al garaje para que fuera reparado; que a tales efectos se hizo una anotación en el libro de entradas y salidas de la Policía, que el automóvil estuvo gran parte de la tarde en el garaje, que él no volvió a verlo hasta las cinco, que Acevedo había regresado a pie a las dos y media, y que su conocimiento de la estada del auto en el garaje lo había obtenido de Acevedo, porque no se había hecho orden alguna para el garaje.

También ofreció el fiscal nuevamente el testimonio de Julio Acevedo, quien dijo había llevado el automóvil al garaje a corregirle un "fallo" y le había explicado el asunto al mecánico Luis Castillo, a quien identificó; que no se hizo orden o documento de clase alguna; que el auto tenía el cable de un "spark" caído; que el auto estuvo de una y media a tres y media en el garaje; que en una primera vista él había declarado que había llevado el auto a engrasar "porque no recordaba", pero que luego en una conversación con el Sargento Ramírez, éste le recordó que lo había llevado porque tenía un fallo; que esa conversación había tenido lugar luego de él ir al garaje e informarle el jefe que "alguien había ido allí a buscar el récord del carro ése y no apareció ni lavado ni engrase"; que el sargento no había estado en sala ni había sido testigo en la primera vista.

Luego el Fiscal trajo a declarar al mecánico Luis Castillo, quien afirmó conocía al policía Julio Acevedo y sabía que éste "siempre" conducía el automóvil 101–109; pero no recordaba haberle arreglado desperfecto alguno a dicho automóvil ni haber "intervenido" con él.

Finalmente, el Sargento Ramírez volvió a declarar y luego de decir que no recordaba haber hablado con el policía Acevedo sobre los hechos del caso, afirmó que él había "corregido" a Acevedo "sobre el hecho de que el automóvil no se había mandado a engrasar sino a corregirle un fallo". Con esa prueba, el tribunal de instancia desestimó la cuestión planteada por la defensa.

Es norma reiterada nuestra la de respetar y sostener la apreciación que hagan los jueces de instancia de la prueba que ante ellos se ofrece. Solamente hemos alterado esos dictámenes en casos de "error manifiesto" en el desempeño de dicha función, cuando un examen detenido de toda la prueba nos convence que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables, o increíbles. *Pueblo* v. *Aponte*, 77 D.P.R. 917, 918 (1955); *Pueblo* v. *Amadeo*, 82 D.P.R. 102, 122 (1961). Son conocidísimas las razones que sostienen esas normas y huelga aquí repetirlas.[1]

Por otro lado, desde hace algún tiempo nos preocupa el hecho de que las declaraciones juradas que sirven de base a muchas órdenes de allanamiento que nos ha correspondido examinar, principalmente aquellas que se expiden en casos de "bolita", contienen unas expresiones estereotipadas mediante las cuales el declarante manifiesta haber observado a ciertas personas manipular material de "bolita" en sitios abiertos a la inspección casual de cualquier transeúnte y a horas de intenso tráfico. Hemos respetado los criterios de

---

[1] En casos criminales juegan, además, importante papel las doctrinas de presunción de inocencia y duda razonable, pero ellas no tienen desde luego, aplicación alguna al incidente de supresión de evidencia.

los jueces de instancia que han aceptado ese tipo de declaración porque, aún cuando es dudoso que en el orden corriente de las cosas los delincuentes procedan de esa manera, no consideramos tal actuación "inherentemente improbable o increíble".

El caso de autos es, sin embargo, mucho más grave. Está presente el primer elemento de improbabilidad ya citado: un agente que declara haber visto a una persona, en horas de la tarde, parada en el balcón de una casa ubicada en una carretera pública, tener en las manos, contar y cotejar una gran cantidad de boletos de "bolipool", persona que huye hacia el interior de la casa cuando advierte la presencia puramente accidental del agente. En segundo lugar, se comprueba que dicho agente durante el año anterior había jurado declaraciones prácticamente idénticas en los únicos tres casos en los que había hecho tales gestiones, resultando que en todos ellos, incluyendo el de autos, el agente no conocía [2] ni investigó a la persona que alegadamente manipulaba boletos de "boli-pool" tan a la vista pública, y luego no supo más de ella. Finalmente, el testimonio de dicho agente sobre el motivo que lo llevó a pasar frente a la casa del acusado en la fecha y hora indicadas en su declaración, quedó prácticamente destruído por sus propias contradicciones y por el testimonio desinteresado que ofrecieron dos empleados públicos.

Atendidas todas esas circunstancias, no tenemos la menor duda que la declaración jurada en la cual se fundó la orden de allanamiento quedó totalmente desacreditada y era falsa en su parte esencial. Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería.

■■■■ ¿Cuáles deben ser las consecuencias de esa determinación? Comencemos por recordar que estamos ante un dere-

---

[2] Se recordará que en uno de los casos el agente declaró conocer a una de las personas por su apodo, pero tampoco la investigó ni procedió contra ella.

cho de tan recio abolengo y vital importancia que es indispensable en todo sistema de justicia civilizado.[3] En la Constitución de nuestro país quedó grabado así: [4]

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

No se interceptará la comunicación telefónica.

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

Los artículos 501 a 520 (34 L.P.R.A. secs. 1811–1830) del Código de Enjuiciamiento Criminal proveen una efectiva reglamentación que complementa el texto constitucional. Eje de esas reglas es la discreción de los jueces. Ella se ejerce tanto al comienzo del procedimiento cuando el agente oficial solicita la orden como al final, cuando impugnada la orden por el acusado corresponde al juez resolver si se cumplieron o no los requisitos de Constitución y de ley. Del ejercicio cuidadoso y sereno de esa discreción en ambas ocasiones

---

[3] "Entre las privaciones de derechos, ninguna es tan efectiva para intimidar una población, aplastar el espíritu del individuo y llevar el terror a todos los corazones. Los registros e incautaciones incontrolados constituyen una de las primeras y más efectivas armas en el arsenal de todo gobierno arbitrario. Y basta que uno haya vivido y trabajado en un pueblo adornado con muchas cualidades admirables pero privado de esos derechos, para saber que la personalidad humana se deteriora y desaparece la dignidad y la confianza en uno mismo cuando los hogares, las personas y los objetos propios están sujetos en cualquier hora a inesperados registros e incautaciones por la policía." Juez Jackson en *Brinegar* v. *United States,* 338 U.S. 160, 180 (1949).

[4] La Enmienda IV de la Constitución federal provee que "No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas." L.P.R.A. Tomo I pág. 157.

dependerá, en gran medida, la continuada eficacia y vitalidad del derecho constitucional.

En la gran mayoría de los estados de la Unión norteamericana no se permite al acusado impugnar la veracidad de las manifestaciones expuestas en la declaración jurada que sirvió de base a la orden de registro, *Search warrants: disputing matters stated in supporting affidavits*, 5 A.L.R.2d 394 (1949) ; 1 Varon, *Searches, Seizures and Immunities*, 1961, págs. 314–318. Esa fue también la regla en Puerto Rico hasta 1957. *Pueblo v. Villarini*, 71 D.P.R. 741 (1950). Sin embargo, tanto en la jurisdicción federal—*Brinegar* v. *United States*, 338 U.S. 160, 163 (1949) ; *Steele* v. *United States*, 267 U.S. 498, 501 (1925) ; *King* v. *United States*, 282 F.2d 398 (Cir. 4, 1960) ; *United States* v. *Napela*, 28 F.2d 898 (N.D., N.Y., 1928) ; Regla 41 (e) de las Reglas Federales de Procedimiento Criminal, 18 USCA—como en nuestro país a partir de la fecha indicada—*Pueblo* v. *Torres*, 80 D.P.R. 245 (1958) ; Ley Núm. 91 de 22 de junio de 1957, Leyes, pág. 468; 34 L.P.R.A. sec. 1828a—ha prevalecido la norma contraria. Es, no obstante, bastante escasa la jurisprudencia federal sobre el asunto y no ha habido ocasión en nuestro medio de explicar las normas aplicables en tales situaciones. La ley pertinente consagra el derecho del acusado a impugnar la declaración jurada y fija los momentos en los cuales procede presentar la moción, pero no añade nada más.[5]

---

[5] "(a) La persona afectada podrá, mediante moción, impugnar la suficiencia de cualquier declaración jurada que sirviere de base a la expedición de una orden de allanamiento mediante prueba de que lo afirmado bajo juramento en la declaración es falso, total o parcialmente.

(b) La moción a estos fines deberá presentarse en cualquier momento en fecha anterior a la señalada para la vista del juicio, a menos que se hubiere presentado una oportunidad para hacerlo antes de dicho momento o si el acusado no tuviere conocimiento de los fundamentos en que basa la moción con anterioridad a dicho momento, y en todo caso la corte tendrá discreción para considerar una moción de esta naturaleza durante el juicio.—"

Es evidente, desde luego, que si la orden es válida de su faz corresponde al acusado probar la falsedad de lo que impugna. *United States* v. *Napela,* supra, pág. 904; *United States* v. *Nagle,* 34 F.2d 321, 322 (Okl., 1953). Como a *Ludwig* v. *State,* 259 P2d. 321, 322 (Okl., 1953). Como a toda actuación oficial, acompaña a la declaración jurada y a la orden de allanamiento una presunción de validez que puede destruirse sólo mediante prueba preponderante y no a base simplemente de conjeturas o rumores. *Dixon* v. *United States,* 211 F.2d 547, 548 (Cir. 5, 1954). Esa prueba corresponde evaluarla inicialmente al juez de instancia y, con las salvedades ya antes explicadas, guardaremos deferencia a su criterio.

Es innecesario, en vista de los hechos del presente caso, dar explicaciones completas del alcance de la exploración judicial en estos asuntos y de lo que en determinadas circunstancias pueda considerarse una afirmación falsa.[6] Dejaremos al más lento pero más confiable proceso de la decisión de controversias particulares ofrecer las necesarias orientaciones. Basta añadir que la ley permite la impugnación mediante prueba de que lo afirmado en la declaración es falso, "total o parcialmente", y que en cada caso deberá el juzgador dictaminar si la falsedad o el error es o no de tal naturaleza y alcance que requiera la anulación de la declaración y, por tanto, de la orden. Como ya explicamos, en el caso de autos la falsedad atañe a la parte más vital de la declaración. Una vez eliminada esa parte, la declaración es insuficiente, no hay causa probable, y la orden de allanamiento debe anularse, así como también la convicción y sentencia basadas en el registro ilegal.

Sabemos que el juego ilegal de la "bolita" causa graves males sociales y económicos en Puerto Rico. Por su conducto

---

[6] Además de las sentencias ya citadas en el texto, examínense *United States* v. *Henderson,* 17 F.R.D.1(D.C. 1954); *United States* v. *Bell,* 17 F.R.D. 13 (D.C. 1955); *Atlanta Enterprises, Inc.* v. *Crawford,* 22 F.2d 834(N.D. Ga., 1927); *United States* v. *Boscarino,* 21 F.2d 575 (W.D., N.Y. 1927); *Lerner* v. *United States,* 151 A.2d 184, 187 (D.C. 1959).

se escurren grandes sumas de dinero que pertenecen en su casi totalidad a los grupos económicamente débiles; ha facilitado la creación y consolidación de organizaciones criminales profesionales que de esa actividad saltan a otras socialmente más peligrosas, y que constituyen un elemento erosivo aún para la propia fuerza pública, Cf. *Pueblo* v. *Adorno*, 81 D.P.R. 518 (1959); la continuada presencia de ese juego ilegal en nuestro medio es un reto perenne al régimen de derecho imperante en el país y al respeto que la ciudadanía debe a los funcionarios encargados del orden público.[7] También sabemos que dicho delito, al igual que otros que comprenden la manipulación y posesión de objetos pequeños, es de muy difícil erradicación, y que desde hace tiempo el estado realiza considerables esfuerzos para combatirlo.

■ Esas duras realidades sociales no pueden, sin embargo, causar el relajamiento de las normas constitucionales que limitan los procedimientos de investigación y acusación criminal. Ellas son un mínimo de garantías que toda sociedad verdaderamente civilizada se da a sí misma en ánimo de conducir los procedimientos de manera responsable y equitativa, y en el entendido que la justicia humana es esencialmente falible y que urge, por tanto, rodearla de protecciones procesales que atenúen su falibilidad. El relajamiento y la desatención de esas garantías mínimas es un precio demasiado alto a pagar por una mayor eficiencia policíaca. Cf. *Pueblo* v. *Meléndez*, 80 D.P.R. 787, 803–804 (1958).

Y a los jueces de instancia conviene recordar, como principales custodios de la diaria observancia de los requisitos

---

[7] Las estadísticas compiladas por la Oficina de Administración de los Tribunales demuestran que en los años fiscales 1959–60 y 1958–59 los casos de loterías clandestinas constituyeron el 14.3% y el 18.87% respectivamente de todos los casos sometidos al Tribunal Superior. Los casos de infracción a la Ley de Bebidas, en la gran mayoría de los cuales también se expiden órdenes de allanamiento, constituyeron el 21.7% y el 18.9% de los totales de los mencionados años.

constitucionales, que "aunque los policías son honestos y sus propósitos son meritorios, la historia comprueba que no son los guardianes apropiados de la tranquilidad que la Enmienda IV protege". *Jones* v. *United States*, 362 U.S. 257, 273 (1960).

*Se revocará la sentencia apelada y se absolverá al acusado.*

