# 2007 DTA 88

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL III**

COMISIÓN DE SERVICIO PÚBLICO DE PUERTO RICO
Recurrida

v.

JUAN J. CEBALLO HERNÁNDEZ H/N/C PRO MEDICS AMBULANCE SERVICE
Recurrido

Núm. KLRA-2007-00417

San Juan, Puerto Rico, a 29 de junio de 2007

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
y los Jueces Aponte Hernández y Morales Rodríguez

Morales Rodríguez, Juez Ponente

### TEXTO COMPLETO DE LA SENTENCIA

Juan J. Ceballo Hernández y su firma Pro Medics Ambulance Services, poseía autorización de la Comisión de Servicio Público para operar una ambulancia. Ceballo Hernández sometió una Solicitud de Autorización de Transportación el 1 de abril de 2003, con el fin de que la agencia le autorizara a añadir cuatro unidades más a los servicios de ambulancias de su firma. Pro Medics Ambulance Services no ha recibido autorización para operarlas.

El 17 de agosto de 2005, una de las unidades que no habían sido autorizadas causó un aparatoso accidente en el peaje de Buchanan, Autopista de Diego, a la altura de Guaynabo. La conducía Freddie Borrero Rivera y le acompañaba Yesenia Aguirre Torres, quien falleció a consecuencia del accidente. La Policía de Puerto Rico comenzó la investigación con la redacción de un informe:

*"De la investigación realizada, se establece que mientras el conductor del auto #1, transitaba en dirección de Oeste a Este por la carretera #22, por el carril #11 y al llegar al kilómetro 8.0, jurisdicción de Guaynabo, éste, a su vez, no tomó en consideración las condiciones del tiempo y éste lo hacía a una velocidad mayor a la permitida por ley, dando lugar, a que por tal motivo y negligencia perdiera el control y dominio del volante, impactando con la parte lateral frontal derecha a la barrera de hormigón que ubica en el lado derecho la cual no resultó con daños; el auto #1 del mismo impacto dio varias vueltas en el pavimento, volcándose la misma (sic). La pasajera el cual (sic) producto del impacto salió expulsada cayendo en el pavimento, siendo ésta atendida y luego transportada en Ambulancia Buchanan (sic), a la Sala de Emergencias Médicas del Centro Médico de Río Piedras, donde fue atendida por el Doctor Pellet #11123; quien diagnosticó trauma en el pecho y heridas abiertas en la mano y pierna derecha y quemaduras por fricción. El conductor de dicho vehículo resultó levemente lesionado, siendo éste atendido en el mismo lugar por el doctor de turno. Al lugar se personó el Agente Ángel L. Cordero #6236 de Servicios Técnicos de Bayamón, quien tomó las fotos del lugar de la escena, las medidas fueron tomadas por el Agente Damián Cruz #19132, de Autopista Buchanan; el vehículo fue transportado al Cuartel Autopista de Buchanan para investigación, los daños no fueron estimados, se confeccionó P.P.R. 128. Se cursó número mensaje #7639. Este caso se continúa investigando. **Hago constar que el conductor del vehículo #1, conducía dicho vehículo con una licencia no autorizada.**"* (Énfasis nuestro)

El 7 de septiembre de 2005, los oficiales de la Comisión, Álida López Ríos y Carlos Núñez Berdecía, rindieron un informe sobre esos hechos:

El 17 de agosto de 2005 hubo un accidente en el Peaje de Buchanan (sic), Autopista de Diego. La compañía Profesional Medics no informó del accidente a la Comisión de Servicio Público. Nos enteramos del referido accidente a través de la División de Seguridad en el Transporte de nuestra Oficina Central.

El 19 de agosto de 2005, por instrucciones de la Sra. Flor M. Cruz Velásquez, Directora de la Oficina Regional de Bayamón, la compañera Álida López y este suscribiente nos dirigimos al Peaje de Buchanan para

investigar las condiciones en que quedó el vehículo accidentado una Ford, modelo 1995, tablillas 718-464, moto núm. IFDJS34F9SHB78231. En el Peaje de Buchanan entrevistamos al Agente Edwin Vargas Villanueva, Placa Núm. 12449, adscrito a la Estación del peaje de la Autopista de Buchanan, quien tiene a su cargo la investigación del accidente. Informó el agente que el vehículo accidentado lo conducía el señor Freddie Borrego Rivera, **quien no tenía licencia de operador de la Comisión de Servicio Público y sólo posee licencia de conductor núm. 4477685.** La pasajera Jesenia Aguirre Torres tampoco poseía licencia de operador de la Comisión de Servicio Público ni del Departamento de Salud de Paramédico. Informó además el agente, que Jesenia no llevaba puesto el cinturón de seguridad al momento del accidente. Que al verificar el vehículo accidentado el cuenta millas reflejaba 90 millas por hora.

El 22 de agosto de 2005 se entrevistó al Supervisor de la compañía, Sr. José Luis Cevallos, el cual indicó que en la madrugada del domingo 21 de agosto de 2005, Jesenia, quien viajaba como pasajera, falleció a consecuencia del accidente.

Esta compañía posee cinco unidades, pero sólo una está autorizada por la Comisión de Servicio Público y es una Ford 1998, tablillas 1421-CP, la última inspección de esta unidad fue el 19 de abril de 2005. Esta compañía tiene pendiente solicitud de adición de cuatro unidades. Recientemente publicaron los edictos y están esperando los affidávits. La autorización TCAMB-219 está vigente hasta el 20 de julio de 2009.

La compañía suministró copias de las licencias de los operadores autorizados que se encontraban prestando servicio el 22 de agosto de 2005.

1. Edwin O. Osorio Figueroa, Lic. Núm. 2562716 que vence el 7 de agosto de 2007.

2. Marisol Román Báez, Lic. Núm. 4011854, vence el 15 de junio de 2008.

3. Sharon M. Carrión, Lic. Núm. 4321043, vence el 29 de octubre de 2009.

4. Erick O. Núñez Rivera, Lic. Núm. 4421623, vence el 10 de enero de 2008.

5. Mateo Sierra Matos, Lic. Núm. 4437635, vence el 25 de octubre de 2006.

El 28 de octubre de 2005, la Comisión le notificó a Pro Medics Ambulance Services una orden de mostrar causa. Vació allí el contenido del informe de los oficiales Núñez y López y también las normas legales y reglamentarias que eran aplicables. Las incluyó todas. Explicitó que el Reglamento para el Servicio de Ambulancias en Puerto Rico, Número 6737, aprobado el 17 de diciembre de 2003, establece, entre otras cosas lo siguiente:

*"Artículo 6 Sección 6.01, Inciso 1:*

*Toda persona calificada para conducir una ambulancia deberá poseer una licencia de operador expedida por la Comisión y cumplir con los requisitos establecidos en los incisos siguientes."*

*Artículo 6 Sección 6.02:*

*Todo asistente Técnico de Emergencias Médicas que interese operar una ambulancia deberá poseer una licencia expedida por la Comisión.*

*Artículo 6 Sección 6.03:*

*Todo Técnico de Emergencias – Paramédico que interese operar una ambulancia deberá poseer una licencia de operador de la Comisión.*

*Artículo 12 Sección 12.01, Inciso 1:*

*Todo operador de ambulancia deberá poseer una licencia de operador expedida por la Comisión y cumplir para ello con los requisitos establecidos en los incisos subsiguientes.*

*Artículo 13 Sección 13.05, Inciso C(1):*

*Para operar este tipo de ambulancia se requerirá de un operador de ambulancia con licencia de conductor, categoría cuatro o cinco del Departamento de Transportación y Obras Públicas y licencia de la Comisión, según lo establecido en el Artículo 6.01 de este Reglamento.*

*Artículo 15, Sección 15.01:*

***No se podrá adicionar, sustituir, permutar, traspasar, retirar o de otra forma modificar la autorización o el vehículo, nave o embarcación autorizado sin el previo consentimiento de la Comisión y sin dar conocimiento al Departamento.***

*Artículo 6 Sección 16.01:*

***La Comisión podrá suspender, enmendar o cancelar la autorización concedida, después de la celebración de vista, cuando se determine que la empresa u operador ha incumplido con las disposiciones de la autorización, ley reglamento, o cualquier orden de la Comisión o del Departamento.***

*(....)*

*Artículo 20, Sección 20.07:*

***Ninguna persona o concesionario autorizado a operar un servicio de ambulancia consentirá o permitirá que su personal opere o realice labores en ambulancias de su propiedad o bajo su control sin haber obtenido la correspondiente licencia de la Comisión."*** (Énfasis nuestro)

Sobre esas bases jurídicas, la Comisión ordenó:

*"A tenor con los hechos antes señalados, **y en consideración a las infracciones legales imputadas**, conforme al poder que le otorga a esta Comisión el Artículo 51 (b) de la Ley Núm. 109 de 28 de junio de 1962, según enmendada, SE ORDENA la celebración de una vista pública, para que el querellado de referencia muestre causa, si alguna tuviera, por la cual no deba ser cancelada su autorización y/o de cualquier otra manera sea sancionado por sus infracciones."* (Énfasis nuestro)

La vista fue celebrada el 9 de octubre de 2006. Los inspectores Núñez y López declararon sobre los hechos de su informe los cuales habían sido vertidos en la Orden para Mostrar Causa. También testificó el presidente de Pro Medics Ambulance Services, Juan J. Ceballo. Sobre su testimonio la Comisión concluyó:

*"El concesionario querellado testificó en la vista que él es el actual presidente de Pro Medics Ambulance Services. Testificó que tenían tres ambulancias con tablillas privadas y una estaba autorizada por la Comisión de Servicio Público. Indicó además el concesionario querellado que tiene a su haber ocho empleados que laboran en los turnos de 4:00 a.m. a 1:00 p.m. y 1:00 p.m. a 10:00 p.m. Agregó el concesionario querellado en*

*la vista de 9 de octubre de 2006 que una ambulancia la opera un grupo de dos personas. Declaró el concesionario querellado que el día del accidente éste no se encontraba en Puerto Rico y su hermano José L. Ceballo era la persona que estaba a cargo de la empresa. Señaló que ese día la única unidad autorizada tuvo desperfectos mecánicos y tuvo que autorizar el uso de una de las otras unidades de su propiedad que no posee autorización de la Comisión de Servicio Público. El concesionario querellado expresó que ocasionalmente este utiliza la ambulancia autorizada por la Comisión en actividades contratadas por la empresa Bacardí. El concesionario-querellado de epígrafe brindó servicio público de transporte de ambulancia con una unidad no autorizada bajo la franquicia TCAMB-219. La unidad, una Ford Van 1995, motor número 1FDJS34F9SHB78231, tablilla 718-464. era conducida por el Sr. Freddie Borrego Rivera, operador no autorizado por la Comisión de Servicio Público para conducir este tipo de vehículo. La Sra. Jesenia Aguirre Torres tampoco poseía licencia de operador autorizada por la Comisión de Servicio Público."* (Énfasis nuestro)

La Comisión a base de esos hechos, resolvió:

*"En primera instancia, es responsabilidad del concesionario asegurarse de que el personal que contrata para explotar su franquicia cuente con las autorizaciones, requisitos, licencias y preparación para realizar las gestiones que se le asignan dentro de la organización. (...) Por otro lado también es obligación del concesionario velar porque no se utilicen vehículos no autorizados para prestar un servicio autorizado. En este caso, el concesionario reconoció que se pretendió utilizar la unidad no autorizada en sustitución de la que si lo estaba. Asumió el riesgo.*

*En este sentido no hace diferencia el que al momento del accidente la unidad no autorizada transportara o no a un paciente; la realidad era que se pretendía prestar el servicio con esa unidad. Todo concesionario está obligado a tener como empleado tantos operadores autorizados por la Comisión como unidades y turnos tenga disponibles.*

*En el caso ante nuestra consideración, ambas personas que se encontrban en la unidad accidentada no contaban con la autorización de esta agencia para conducir un vehículo que se destine a este servicio. (...)*

*SE ORDENA a la Oficina Regional de Bayamón a incautar la tablilla pública autorizada a dicho concesionario bajo el mencionado número de autorización y a no realizar trámite alguno ulterior con relación a dicha franquicia."* (Énfasis nuestro).

Inconforme, Pro Medics Ambulance Services acude ante nosotros con los siguientes señalamientos de error:

*"Erró la Comisión de Servicio Público al adjudicarse indebidamente jurisdicción sobre un accidente de tránsito en un vehículo privado, el cual no brindaba servicio público de transporte por paga - según lo dispone la Ley de Servicio Público - ni operaba como servicio de ambulancias - según definido por la Ley de Servicio de Ambulancias, Ley Número 225 de 23 de julio de 1974."*

Incurrió la Comisión de Servicio Público en violación crasa del debido proceso de ley al omitir todas las instancias formales en un proceso de adjudicación y emitir una resolución y orden sin estar sustentada en evidencia admitida durante la vista adjudicativa.

Pro Medics Ambulance Services alegó durante todo el proceso que la unidad en la que iban sus empleados transitaba como un mero vehículo privado —no como ambulancia—, el día del accidente. Alegó además que tampoco sus empleados se dirigían a dar un servicio a un paciente. Arguyó pues que la Comisión no tenía jurisdicción sobre el caso por no haberse tratado de *"un servicio público de transporte por paga - según lo dispone la Ley de Servicio Público - ni operaba como servicio de ambulancias - según definido por la Ley de*

*Servicio de Ambulancias, Ley Número 225 de 23 de julio de 1974.*" En su testimonio Ceballo declaró:

"*P. Describa la utilidad, el uso que se le daba a esa unidad vehicular, en cu compañía. ¿Para qué se usaba?*

*R. Privada.*

*P. Describa, sea más descriptivo. Diga a qué se refiere.*

*R. Bueno, cuando... cualquier cosa que yo necesitaba para buscar para la compañía cosas privadas o, por ejemplo, si tenía un paciente en un centro renal y estaba para salir, pues, yo mandaba a uno de los empleados que se quedara allí esperando con ese paciente hasta la unidad esté autorizada (ininteligible) para que nos pudiera perder, y hubiera, pues, representación de la compañía en ese sitio.*

*P. Le pregunto, ¿cuántos pacientes enfermes, lesionados, usted, su compañía, transportó en esa unidad accidentada?*

*R. Ninguno.*

*P. El día que ocurrió el accidente, describa ese día. ¿Para qué, porqué ese vehículo estaba en la calle ese día? ¿Cuál era el propósito?*

**R. Pues, como a las 2:00 de la tarde, la unidad que se supone que estuviera en la calle tuvo desperfectos mecánicos, pues había que buscar al paciente que se supone que se buscara. Le dijeron a la oficina que mandara a uno de los muchachos a que se estuviera en el lugar que está el paciente...**

*P. ¿En qué lugar estaba el paciente?*

**R.. En Hato Rey.**

*P. ¿En dónde en Hato Rey?*

**R.. En (ininteligible) de Hato Rey.**

*P. ¿En que?*

**R.. En el Centro Renal.**

**P.. Centro Renal. Perfecto. Entonces, siga, continúe, por favor.**

**R.. Pues, se indicó a los muchachos que hicieran el favor, pasaran allá para que se quedaran con el paciente hasta que la unidad terminara para que regresara y buscaran al paciente.**

*P. ¿Pero qué unidad? ¿De qué unidad estamos hablando? ¿Cuál era la unidad que se iba a utilizar para transportar al paciente?*

**R.. La 1421CP 1998.**

*P. ¿Y qué tipo de autorización tiene esa unidad?*

**R.. La 1428CP (sic), la de servicio público.**

*P. Okey. ¿Qué pretensión se tenía, si alguna, con la unidad ésta, privada, que no estaba autorizada, ese día? ¿Se tenía alguna pretensión de...*

*R. No, ninguna, solamente que los, los empleados que se mandaron se quedaban en el sitio para atender al paciente cuando saliera, porque estos pacientes cuando salen no se pueden dejar solos en el Centro Renal.*

*P. Oiga, ahora que menciona a los empleados, diga los nombres de esos empleados que fueron enviados en ese vehículo ese día.*

*R. Freddy Borrero y Yesenia Aguirre.*

*P. Okey. ¿Cuál era la función o funciones de esos empelados en su compañía?*

*R. Esos empleados eran... por lo menos Freddy Borrero era estudiante, y estaban por solicitudes de donde estudian, que le dan... según ellos le llaman, son 300 horas que tienen que acumular para poder ser técnicos de emergencia médicas, y los refieren a ciertas compañías de ambulancia para que hagan su, su... 300 horas voluntarias para poder ser técnico de emergencias médicas.*

*P. ¿Y la otra joven?*

*R. La otra joven, pues, ya era técnica, ya estaba graduada, pero todavía no había cogido su reválida como paramédico, pero tenía su certificado como técnico de emergencias médicas, y había empezado a trabajar como auxiliar de la compañía.*

*P. Es decir, ¿esas personas, esos empleados, uno estaba en etapa preparativa, otra estaba esperando por un trámite burocrático del Gobierno, tuvieron, tenían la función de transportar pacientes lesionados?*

*R. No.*

*P. Ni nada de eso.*

*R. No.*

*P. Okey. ¿y porqué no?*

*R. Porque no estaban todavía completamente trabajando con la compañía.* " (Énfasis nuestro)

La Comisión escuchó ese testimonio. Concluyó, como es obvio, que Ceballo admitió que el accidente ocurrió cuando el vehículo identificado como ambulancia se dirigía al encuentro de un paciente de diálisis. *"En este sentido —añadió—, no hace diferencia el que al momento del accidente la unidad no autorizada transportara o no a un paciente; la realidad era que se pretendía prestar el servicio con esa unidad."* Eso fue lo que la Comisión creyó a base del propio testimonio del dueño de Pro Medics Ambulance Services. Verificó allí que Ceballo permitió que un empleado suyo, sin *"poseer una licencia de operador"* —Art. 6 del Reglamento—, manejara una ambulancia adicionada a las de Pro Medics Ambulante Services sin *"el previo consentimiento de la Comisión"* —Art. 15—, por lo que procedió a cancelar la autorización concedida a la firma para operar su franquicia —Art. 16. Pero su apreciación encuentra fundamento, no sólo en esa admisión de Ceballo, sino en inconsistencias de sus declaraciones en torno a lo que hacía con las ambulancias y con sus empleados normalmente.

*"P. ¿Cómo, cómo son los "crews" de esta ambulancia? ¿Cuántas personas la operan, digamos, en el*

*transporte normal de un paciente?*

R. Bueno, dos personas.

P. Que son el operador...

R. El operador y el técnico, el técnico, el paramédico.

P. El "crew" es de dos personas.

R. Dos personas.

P. O sea, que tenemos una ambulancia... tenemos 5 ambulancias, 4 privadas y 1 autorizada por la Comisión, y tenemos 8 empleados.

R. Tenemos 4

P. ¿Empleados?

R. Cuatro ambulancias. Una para el servicio público y tres privadas.

P. Oh, fue que entendimos que la solicitud en adición era de 4.

R. Al principio era de 4.

P. O sea, que ahora mismo tienen 4 ambulancias, 3 con tablilla privada y ...

R. Una de servicio público.

P. Y tienen 8 empleados.

R. Ocho empleados.

P. ¿Y todos estos empleados trabajan con la ambulancia suya, con la pública?

R. Con la pública.

P. O sea, que tiene 8 empleados para una ambulancia. Mire, ¿cuántos pacientes tiene ahora mismo, si nos puede decir más o menos, no tiene que ser la cantidad exacta, cuántos pacientes más o menos usted atiende actualmente en esto de...

R. Tengo 4 pacientes renales.

P. Cuatro pacientes renales. ¿Y usted lo que tiene son 4 pacientes con una ambulancia?

R. Sí.

P. Para citas y ese tipo de cosas.

R. Pacientes que van a diálisis.

P. A diálisis. ¿Usted nos indicó que también, dentro de las funciones que usted realiza, pues, está la de conseguir contratos...

R. Estamos para conseguir contratos.

P. ¿Qué otro tipo de actividad ustedes desempeñan con pacientes, que no sea de tipo renal, pacientes renales?

R. Bueno, actividades, actividades como pa´ buscar pacientes en la calle, ninguna. Actividades, si me contraran como... Dos semanas atrás, la Bacardí me contrató la ambulancia un domingo para una actividad de la Bacardí, que la ambulancia se quedaba allí parqueada, se buscan dos paramédicos empleados, y se dejan allí.

P. O sea, eso es una actividad...

R. Son actividades que yo hago.

P. Pero que también las hace.

R. Si me llaman, sí.

P. O sea, que en esa actividad, por ejemplo, de la que me está hablando ahora de la Bacardí, la que usted contrata con la Bacardí, usted va y preposiciona esa –si se puede usar así en español—estoy traduciendo, usted va y posiciona esa ambulancia allí en la Bacardí y está en la espera de que suceda alguna eventualidad...

R. Y se mueva.

P. ... y se mueva, y dé el servicio. Le pregunto, ¿esa ambulancia, usted cobra por ese servicio a la Bacardí?

R. Sí.

P. ¿Y esa ambulancia que usted tiene allí en la Bacardí, tiene pacientes adentro?

R. No.

P. No tiene ningún paciente dentro.

R. No.

P. No sé en este caso, me dirá usted, ¿en este caso, transportaron a algún paciente?

R. Ninguno.

P. ¿Y usted cobró por este servicio?

R. Sí.

P. ¿Y usted entiende que eso es un servicio de ambulancia?

R. **Bueno, cuando le piden a usted un contrato como se le pide a usted de allí, que es de una actividad, que la ambulancia va a estar allí y que le están pidiendo la ambulancia, pues, es un servicio.**

P. ¿Y allí no hay pacientes ningunos envueltos?

R. Puede...

P. Puede ser que haya, pero...

R. Ha pasado. Usted sabe bien, que pacientes se han pasado de lo que tienen que...

P. Sí, claro, y sé que...

R. Y hay que transportarlos, darles el servicio.

P. Pero no necesariamente hay un paciente allí.

R. No.

P. Pero se cobra por el servicio de ambulancia.

R. Tiene que cobrarse porque es un contrato que hicieron.

(...)

P. Usted, sabemos que se ha preparado para este caso, ¿usted ese día 17 de agosto, que fue el día del accidente, del 2005, el accidente trágico de ese día, quiénes estaban en el "schedule" ese día, que le correspondiera...

R. Eso no se lo podría decir porque yo no estaba aquí.

P. ¿No estaba a dónde?

R. No estaba aquí.

P. ¿Aquí en Puerto Rico.

R. En Puerto Rico.

P. Ah, ¿usted no estaba el día del accidente?

R. No.

P. Pero ese documento debe existir.

R. Estaba el, como le expliqué, estaba el que administraba la compañía, José Luis Ceballo.

P. Por eso, pero ese "schedule", de ese día...

R. Me imagino que sí.

P. ...debe existir en las facilidades...

R. Me imagino.

P. ...en los archivos...

R. si no lo han... como decir, agotado o lo que sea, debe aparecer en la compañía.

P. Bueno, pero si todos los días se hace un "schedule"... ¿Todos los días no se hacen "shedule", o eso era mensual, o semanal, o...

R. Eso se hace cada dos semanas lo cuadran.

P. O sea, que debe haber un itinerario...

R. Eso lo hacen cada dos semanas y los archivan.

P. ... de esa semana, que cayó el día 17. Eso lo que tiene es un año nada más.

R. Sí, pero que allá los itinerarios, pues, me imagino, por lo menos yo no los hago...

P. Usted no los hace.

R. Yo no los hago, yo no soy el que brego... Yo solamente soy, por decir, el presidente, el que invertí el dinero. Eso lo bregaba el señor José Luis Ceballo, y como ahora, que después él se fue, lo está bregando el señor Luis Javier Rivera.

P. ¿Usted no puede decir hoy quién estaba en turno ese día?

R. Ese día... Bueno, yo le puedo decir, creo que habían dos.

P. Que habían dos.

R. Habían dos ese día.

P. ¿Quiénes serían esos dos?

R. Me imagino que era Luis Taboas y ... Aisha, Aisha, o algo así. No sé. Son lo que me imagino que estaban ese día.

P. O sea, ¿qué ni Freddie ni Yesenia cualificaban para estar en algún itinerario o...

R. Como itinerario no. Ellos estaban para estar con ellos, porque estaban aprendiendo lo que era una evaluación de técnico de emergencias médicas para cuando fueran a coger su reválida, pues, pudieran pasarla.

P. Y usted nos mencionó que ellos fueron allí a la sala de, de... la sala de renal, de Hato Rey.

R. Ajá-

P. ¿A qué misión fueron allí ellos dos?

*R. Como le dije, ellos fueron... Una paciente que había allí que salía a las 4:30 de la tarde, fueron para atender a esa paciente, a que se quedara allí hasta que llegara la otra unidad.*

*P. La otra unidad que iba a llegar con las personas que estaban en...*

*R. Las personas que estaban supuestamente a estar viendo la unidad correspondiente.*

*P. ¿Y esa situación se da frecuentemente?*

*R. No.*

*P. ¿Casi nunca se daba eso de...?*

*R. No se daba.*

*P. ¿Usted está solicitando que la Comisión le apruebe a usted tres ambulancias más, o cuatro?*

*R. Eran cuatro; son tres.*

*P. ¿Y nos mencionó anteriormente que tiene actualmente cuatro pacientes?*

*R. Solamente cuatro pacientes. Lo que estoy buscando es contratos, pero si no tengo las unidades, no me van a dar los contratos.*

*P. ¿Si no tiene las unidades, no le dan el contrato?*

*R. No me dan el contrato, porque tienes que llevar las unidades equipadas y con sus tablillas."* (Énfasis nuestro)

La evidencia esencial de este caso, como hemos visto, fue aportada por Ceballo en su deber de mostrar causa por la cual no debía cancelársele su franquicia. Aunque su prueba oral fue sometida junto con la versión que él quiso comunicar, la Comisión no creyó que la utilización del vehículo en cuestión por empleados no autorizados no fuera con la intención de transportar al paciente. Ceballo insistió que era para meramente acompañarlo mientras venía otra ambulancia a buscarlo. La Comisión infirió de la totalidad de su testimonio, con pleno derecho, que la firma permitía que dicha transportación ocurriera; y que ese día la ambulancia accidentada se dirigía a hacerlo. La inferencia de la Comisión y su consecuente determinación, son razonables. Es un asunto de estricta credibilidad que corresponde dirimir al juzgador de los hechos.

La apreciación realizada por el foro que observa la prueba y la credibilidad que dicho foro le otorgue, debe ser objeto de gran deferencia por los tribunales apelativos. En ausencia de circunstancias que demuestren que el foro apelado actuó movido por pasión, prejuicio, parcialidad o error manifiesto, no debemos intervenir con determinaciones de hechos. *Álvarez de Choudens et. als. v. Rivera Vázquez,* res. el 17 de junio de 2005, **2005 JTS 90**, 164 D.P.R. _____ (2005). La razón de esa pauta de deferencia la explicitó el Tribunal Supremo en *Ortiz v. Cruz Pabón,* 103 D.P.R. 939, 946-947 (1975), con recurso a muy autorizada doctrina científica:

*"La verdad es que el testigo debe ser oído, y visto, interrogado y mirado."* Así se expresa el eminente procesalista Carnelutti en su obra Rivista di Diritto processuale civile, año 1929. Don Alfonso de Paula Pérez, La prueba de testigos en el proceso civil español (ed. Reus, Madrid, 1968, pág. 7), añade: *"y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias*

*que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación."*

Ceballos fue observado por la Comisión al testificar. Sus declaraciones, en cuanto al uso de sus ambulancias no autorizadas como vehículos privados, y no para el servicio de pacientes, no fueron creídas. Nosotros no encontramos en letra muda de la transcripción, ni en el expediente ante nosotros, otras circunstancias que nos obliguen a descartar el juicio emitido. Una vez más se nos pide *"ser tan inocentes como para creer declaraciones que nadie más creería"*. *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961). Por consiguiente, resolvemos que Pro Medics Ambulance Services violó la reglamentación citada al permitir el uso de una unidad no autorizada por un operador no autorizado; que eso conllevaba la cancelación de su franquicia.

Hemos visto que la Comisión tenía jurisdicción para investigar las circunstancias del accidente que dio lugar a este caso y determinar si se violaron las normas bajo su autoridad. Pro Medics Ambulance Service se dedica a proveer un servicio que está reglamentado por la Comisión debido a que está confiado por ley a su jurisdicción. Las reglas pertinentes a su caso le fueron citadas con minuciosidad en una orden para que enfrentara la evidencia en su contra y llevara la suya propia a un proceso adjudicativo formal. La Comisión de Servicio Público tuvo ante sí la evidencia aquí resumida. Esa evidencia es suficiente para sostener la Resolución impugnada. Resolvemos pues que el procedimiento de vista oral para mostrar causa utilizado por la Comisión fue conforme al debido proceso de ley.

En virtud de lo expuesto, se deniega la paralización en auxilio de jurisdicción y se confirma la Resolución recurrida.

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones